EDGAR *v.* MITE CORP. ET AL.

No. 80–1188.   Argued November 30, 1981—Decided June 23, 1982

JUSTICE WHITE delivered the opinion of the Court with respect to Parts I, II, and V–B, concluding that:

1. The case is not moot. Because the Secretary of State has indicated his intention to enforce the Illinois Act against MITE, a reversal of the District Court's judgment would expose MITE to civil and criminal liability for making an offer in violation of the Act. P. 630.

2. The Illinois Act is unconstitutional under the Commerce Clause, because it imposes burdens on interstate commerce that are excessive in light of the local interests the Act purports to further. *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137. Illinois' asserted interests in protecting resident security holders and regulating the internal affairs of companies incorporated under Illinois law are insufficient to outweigh such burdens. Pp. 643–646.

WHITE, J., delivered an opinion, joined in its entirety by BURGER, C. J., Parts I, II, and V–B of which are the opinion of the Court. BLACKMUN, J., joined Parts I, II, III, and IV. POWELL, J., joined Parts I and V–B. STEVENS and O'CONNOR, JJ., joined Parts I, II, and V. POWELL, J., filed an opinion concurring in part, *post*, p. 646. STEVENS, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 647. O'CONNOR, J., filed an opinion concurring in part, *post*, p. 655. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 655. REHNQUIST, J., filed a dissenting opinion, *post*, p. 664.

*Russell C. Grimes, Jr.*, Assistant Attorney General of Illinois, argued the cause for appellant. With him on the briefs were *Tyrone C. Fahner*, Attorney General, and *Paul J. Bargiel*, Assistant Attorney General.

*Richard W. Hulbert* argued the cause for appellees. With him on the brief was *Christopher H. Lunding*.

*Eugene D. Berman*, Assistant Attorney General, argued the cause for the State of New York as *amicus curiae* urging reversal. With him on the brief were *Robert Abrams*, Attorney General, *Shirley Adelson Siegel*, Solicitor General, *Linda S. Martinson*, Deputy Assistant Attorney General, and *Elizabeth Block*, Assistant Attorney General.

*Stephen M. Shapiro* argued the cause for the Securities and Exchange Commission as *amicus curiae* urging affirmance. With him on the brief were *Acting Solicitor General*

*Wallace, Assistant Attorney General Baxter, Deputy Solicitor General Geller, Ralph C. Ferrara, Paul Gonson, Daniel L. Goelzer, and James R. Farrand.* *

JUSTICE WHITE delivered an opinion, Parts I, II, and V–B of which are the opinion of the Court.†

The issue in this case is whether the Illinois Business Take-Over Act, Ill. Rev. Stat., ch. 121½, ¶ 137.51 *et seq.* (1979), is unconstitutional under the Supremacy and Commerce Clauses of the Federal Constitution.

## I

Appellee MITE Corp. and its wholly owned subsidiary, MITE Holdings, Inc., are corporations organized under the laws of Delaware with their principal executive offices in Connecticut. Appellant James Edgar is the Secretary of State of Illinois and is charged with the administration and enforcement of the Illinois Act. Under the Illinois Act any takeover offer[1] for the shares of a target company must be

---

*Briefs of *amici curiae* urging reversal were filed by *William J. Brown,* Attorney General, and *Roger P. Sugarman,* Assistant Attorney General, for the State of Ohio; by *Marshall Coleman,* Attorney General, *Walter H. Ryland,* Chief Deputy Attorney General, and *Karen A. Gould,* Assistant Attorney General, for the Commonwealth of Virginia; and by *Orestes J. Mihaly, Stephen M. Coons,* and *K. Houston Matney* for the North American Securities Administrators Association, Inc.

†THE CHIEF JUSTICE joins the opinion in its entirety; JUSTICE BLACKMUN joins Parts I, II, III, and IV; JUSTICE POWELL joins Parts I and V–B; and JUSTICE STEVENS and JUSTICE O'CONNOR join Parts I, II, and V.

[1] The Illinois Act defines "take-over offer" as "the offer to acquire or the acquisition of any equity security of a target company, pursuant to a tender offer . . . ." Ill. Rev. Stat., ch. 121½, ¶ 137.52–9 (1979). "A tender offer has been conventionally understood to be a publicly made invitation addressed to all shareholders of a corporation to tender their shares for sale at a specified price." Note, The Developing Meaning of "Tender Offer" Under the Securities Exchange Act of 1934, 86 Harv. L. Rev. 1250, 1251 (1973) (footnotes omitted). The terms "tender offer" and "takeover offer" are often used interchangeably.

registered with the Secretary of State. Ill. Rev. Stat., ch. 121½, ¶ 137.54.A (1979). A target company is defined as a corporation or other issuer of securities of which shareholders located in Illinois own 10% of the class of equity securities subject to the offer, or for which any two of the following three conditions are met: the corporation has its principal executive office in Illinois, is organized under the laws of Illinois, or has at least 10% of its stated capital and paid-in surplus represented within the State. ¶ 137.52–10. An offer becomes registered 20 days after a registration statement is filed with the Secretary unless the Secretary calls a hearing. ¶ 137.54.E. The Secretary may call a hearing at any time during the 20-day waiting period to adjudicate the substantive fairness of the offer if he believes it is necessary to protect the shareholders of the target company, and a hearing must be held if requested by a majority of a target company's outside directors or by Illinois shareholders who own 10% of the class of securities subject to the offer. ¶ 137.57.A. If the Secretary does hold a hearing, he is directed by the statute to deny registration to a tender offer if he finds that it "fails to provide full and fair disclosure to the offerees of all material information concerning the take-over offer, or that the take-over offer is inequitable or would work or tend to work a fraud or deceit upon the offerees . . . ." ¶ 137.57.E.

On January 19, 1979, MITE initiated a cash tender offer for all outstanding shares of Chicago Rivet & Machine Co., a publicly held Illinois corporation, by filing a Schedule 14D–1 with the Securities and Exchange Commission in order to comply with the Williams Act.[2] The Schedule 14D–1 indi-

---

[2] The Williams Act, 82 Stat. 454, codified at 15 U. S. C. §§ 78m(d)–(e) and 78n(d)–(f), added new §§ 13(d), 13(e), and 14(d)–(f) to the Securities Exchange Act of 1934. Section 14(d)(1) of the Securities Exchange Act requires an offeror seeking to acquire more than 5% of any class of equity security by means of a tender offer to first file a Schedule 14D–1 with the Securities and Exchange Commission. The Schedule requires disclosure

cated that MITE was willing to pay $28 per share for any and all outstanding shares of Chicago Rivet, a premium of approximately $4 over the then-prevailing market price. MITE did not comply with the Illinois Act, however, and commenced this litigation on the same day by filing an action in the United States District Court for the Northern District of Illinois. The complaint asked for a declaratory judgment that the Illinois Act was pre-empted by the Williams Act and violated the Commerce Clause. In addition, MITE sought a temporary restraining order and preliminary and permanent injunctions prohibiting the Illinois Secretary of State from enforcing the Illinois Act.

Chicago Rivet responded three days later by bringing suit in Pennsylvania, where it conducted most of its business, seeking to enjoin MITE from proceeding with its proposed tender offer on the ground that the offer violated the Pennsylvania Takeover Disclosure Law, Pa. Stat. Ann., Tit. 70, § 71 *et seq.* (Purdon Supp. 1982–1983). After Chicago Rivet's efforts to obtain relief in Pennsylvania proved unsuccessful,[3] both Chicago Rivet and the Illinois Secretary of State

---

of the source of funds used to purchase the target shares, past transactions with the target company, and other material financial information about the offeror. In addition, the offeror must disclose any antitrust or other legal problems which might result from the success of the offer. 17 CFR § 240.14d–100 (1981). Section 14(d)(1) requires the offeror to publish or send a statement of the relevant facts contained in the Schedule 14D–1 to the shareholders of the target company.

In addition, § 13(d), added by the Williams Act, requires a purchaser of any equity security registered pursuant to § 12 of the Securities Exchange Act, 15 U. S. C. § 78*l*, to file a Schedule 13D with the Commission within 10 days after its purchases have exceeded 5% of the outstanding shares of the security. Schedule 13D requires essentially the same disclosures as required by Schedule 14D–1. Compare 17 CFR § 240.13d–101 (1981) with 17 CFR § 240.14d–100 (1981).

[3] In addition to filing suit in state court, Chicago Rivet filed a complaint with the Pennsylvania Securities Commission requesting the Commission to enforce the Pennsylvania Act against MITE. On January 31, 1979, the

took steps to invoke the Illinois Act. On February 1, 1979, the Secretary of State notified MITE that he intended to issue an order requiring it to cease and desist further efforts to make a tender offer for Chicago Rivet. On February 2, 1979, Chicago Rivet notified MITE by letter that it would file suit in Illinois state court to enjoin the proposed tender offer. MITE renewed its request for injunctive relief in the District Court and on February 2 the District Court issued a preliminary injunction prohibiting the Secretary of State from enforcing the Illinois Act against MITE's tender offer for Chicago Rivet.

MITE then published its tender offer in the February 5 edition of the Wall Street Journal. The offer was made to all shareholders of Chicago Rivet residing throughout the United States. The outstanding stock was worth over $23 million at the offering price. On the same day Chicago Rivet made an offer for approximately 40% of its own shares at $30 per share.[4] The District Court entered final judgment on February 9, declaring that the Illinois Act was pre-empted by the Williams Act and that it violated the Commerce Clause. Accordingly, the District Court permanently enjoined enforcement of the Illinois statute against MITE. Shortly after final judgment was entered, MITE and Chicago Rivet entered into an agreement whereby both tender offers were withdrawn and MITE was given 30 days to examine the books and records of Chicago Rivet. Under the agreement MITE was either to make a tender offer of $31 per share be-

---

Pennsylvania Securities Commission decided that it would not invoke the Pennsylvania Takeover Disclosure Law. The next day, the United States District Court for the Western District of Pennsylvania, to which MITE had removed the state-court action, denied Chicago Rivet's motion for a temporary restraining order.

[4] Chicago Rivet's offer for its own shares was exempt from the requirements of the Illinois Act pursuant to Ill. Rev. Stat., ch. 121½, ¶ 137.52–9(4) (1979).

fore March 12, 1979, which Chicago Rivet agreed not to oppose, or decide not to acquire Chicago Rivet's shares or assets.   App. to Brief for Appellees 1a–4a.   On March 2, 1979, MITE announced its decision not to make a tender offer.

The United States Court of Appeals for the Seventh Circuit affirmed *sub nom. MITE Corp.* v. *Dixon,* 633 F. 2d 486 (1980).   It agreed with the District Court that several provisions of the Illinois Act are pre-empted by the Williams Act and that the Illinois Act unduly burdens interstate commerce in violation of the Commerce Clause.   We noted probable jurisdiction, 451 U. S. 968 (1981), and now affirm.

## II

The Court of Appeals specifically found that this case was not moot, 633 F. 2d, at 490, reasoning that because the Secretary has indicated he intends to enforce the Act against MITE, a reversal of the judgment of the District Court would expose MITE to civil and criminal liability[5] for making the February 5, 1979, offer in violation of the Illinois Act.   We agree.   It is urged that the preliminary injunction issued by the District Court is a complete defense to civil or criminal penalties.   While, as JUSTICE STEVENS' concurrence indicates, that is not a frivolous question by any means; it is an issue to be decided when and if the Secretary of State initiates an action.   That action would be foreclosed if we agree with the Court of Appeals that the Illinois Act is unconstitutional.   Accordingly, the case is not moot.

## III

We first address the holding that the Illinois Take-Over Act is unconstitutional under the Supremacy Clause.   We note at the outset that in passing the Williams Act, which is

---

[5] The Secretary of State may bring an action for civil penalties for violations of the Illinois Act., Ill. Rev. Stat., ch. 121½, ¶ 137.65 (1979), and a person who willfully violates the Act is subject to criminal prosecution. ¶ 137.63.

an amendment to the Securities Exchange Act of 1934, Congress did not also amend § 28(a) of the 1934 Act, 15 U. S. C. § 78bb(a).[6]   In pertinent part, § 28(a) provides as follows:

"Nothing in this title shall affect the jurisdiction of the securities commission (or any agency or officer performing like functions) of any State over any security or any person insofar as it does not conflict with the provisions of this title or the rules and regulations thereunder."   48 Stat. 903.

Thus Congress did not explicitly prohibit States from regulating takeovers; it left the determination whether the Illinois statute conflicts with the Williams Act to the courts.   Of course, a state statute is void to the extent that it actually conflicts with a valid federal statute; and

"[a] conflict will be found 'where compliance with both federal and state regulations is a physical impossibility . . . ,' *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142–143 (1963), or where the state 'law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941); *Jones* v. *Rath Packing Co.*, [430 U. S. 519,] 526, 540–541 [(1977)]. Accord, *De Canas* v. *Bica*, 424 U. S. 351, 363 (1976)." *Ray* v. *Atlantic Richfield Co.*, 435 U. S. 151, 158 (1978).

Our inquiry is further narrowed in this case since there is no contention that it would be impossible to comply with both

---

[6] There is no evidence in the legislative history that Congress was aware of state takeover laws when it enacted the Williams Act.   When the Williams Act was enacted in 1968, only Virginia had a takeover statute.   The Virginia statute, Va. Code § 13.1–528 (1978), became effective March 5, 1968; the Williams Act was enacted several months later on July 19, 1968. Takeover statutes are now in effect in 37 States.   Sargent, On the Validity of State Takeover Regulation: State Responses to *MITE* and *Kidwell*, 42 Ohio St. L. J. 689, 690, n. 7 (1981).

the provisions of the Williams Act and the more burdensome requirements of the Illinois law. The issue thus is, as it was in the Court of Appeals, whether the Illinois Act frustrates the objectives of the Williams Act in some substantial way.

The Williams Act, passed in 1968, was the congressional response to the increased use of cash tender offers in corporate acquisitions, a device that had "removed a substantial number of corporate control contests from the reach of existing disclosure requirements of the federal securities laws." *Piper* v. *Chris-Craft Industries, Inc.*, 430 U. S. 1, 22 (1977). The Williams Act filled this regulatory gap. The Act imposes several requirements. First, it requires that upon the commencement of the tender offer, the offeror file with the SEC, publish or send to the shareholders of the target company, and furnish to the target company detailed information about the offer. 15 U. S. C. § 78n(d)(1); 17 CFR § 240.24d–3 (1981). The offeror must disclose information about its background and identity; the source of the funds to be used in making the purchase; the purpose of the purchase, including any plans to liquidate the company or make major changes in its corporate structure; and the extent of the offeror's holdings in the target company. 15 U. S. C. § 78m(d)(1) (1976 ed., Supp. IV); 17 CFR § 240.13d–1 (1981). See also n. 2, *supra*. Second, stockholders who tender their shares may withdraw them during the first 7 days of a tender offer and if the offeror has not yet purchased their shares, at any time after 60 days from the commencement of the offer. 15 U. S. C. § 78n(d)(5).[7] Third, all shares tendered must be purchased for the same price; if an offering price is increased, those who have already tendered receive the benefit of the increase. 15 U. S. C. § 78n(d)(7).[8]

---

[7] The 7-day withdrawal period contained in the Williams Act has been extended to 15 business days by the Commission. 17 CFR § 240.14d–7(a)(1) (1981).

[8] The Williams Act also provides that when the number of shares tendered exceeds the number of shares sought in the offer, those shares tendered during the first 10 days of the offer must be purchased on a pro rata

There is no question that in imposing these requirements, Congress intended to protect investors. *Piper* v. *Chris-Craft Industries, Inc., supra*, at 35; *Rondeau* v. *Mosinee Paper Corp.*, 422 U. S. 49, 58 (1975); S. Rep. No. 550, 90th Cong., 1st Sess., 3–4 (1967) (Senate Report). But it is also crystal clear that a major aspect of the effort to protect the investor was to avoid favoring either management or the takeover bidder. As we noted in *Piper*, the disclosure provisions originally embodied in S. 2731 "were avowedly pro-management in the target company's efforts to defeat takeover bids." 430 U. S., at 30. But Congress became convinced "that takeover bids should not be discouraged because they serve a useful purpose in providing a check on entrenched but inefficient management." Senate Report, at 3.[9] It also became apparent that entrenched management was often successful in defeating takeover attempts. As the legislation evolved, therefore, Congress disclaimed any "intention to provide a weapon for management to discourage takeover bids," *Rondeau* v. *Mosinee Paper Corp., supra*, at 58, and expressly embraced a policy of neutrality. As Senator Williams explained: "We have taken extreme care to avoid tipping the scales either in favor of management or in favor of the person making the takeover bids." 113 Cong. Rec. 24664 (1967). This policy of "evenhandedness," *Piper* v. *Chris-Craft Industries, Inc., supra*, at 31, represented a conviction that neither side in the contest should be extended additional advantages vis-à-vis the investor, who if furnished with adequate information would be in a position to make his

---

basis. 15 U. S. C. § 78n(d)(6). The Act also contains a general antifraud provision, 15 U. S. C. § 78n(e), which has been interpreted to require disclosure of material information known to the offeror even if disclosure were not otherwise required. See, *e. g.*, *Sonesta International Hotels Corp.* v. *Wellington Associates*, 483 F. 2d 247, 250 (CA2 1973).

[9] Congress also did not want to deny shareholders "the opportunities which result from the competitive bidding for a block of stock of a given company," namely, the opportunity to sell shares for a premium over their market price. 113 Cong. Rec. 24666 (1967) (remarks of Sen. Javits).

own informed choice. We, therefore, agree with the Court of Appeals that Congress sought to protect the investor not only by furnishing him with the necessary information but also by withholding from management or the bidder any undue advantage that could frustrate the exercise of an informed choice. 633 F. 2d, at 496.

To implement this policy of investor protection while maintaining the balance between management and the bidder, Congress required the latter to file with the Commission and furnish the company and the investor with all information adequate to the occasion. With that filing, the offer could go forward, stock could be tendered and purchased, but a stockholder was free within a specified time to withdraw his tendered shares. He was also protected if the offer was increased. Looking at this history as a whole, it appears to us, as it did to the Court of Appeals, that Congress intended to strike a balance between the investor, management, and the takeover bidder. The bidder was to furnish the investor and the target company with adequate information but there was no "inten[tion] to do . . . more than give incumbent management an opportunity to express and explain its position." *Rondeau* v. *Mosinee Paper Corp.*, *supra*, at 58. Once that opportunity was extended, Congress anticipated that the investor, if he so chose, and the takeover bidder should be free to move forward within the time frame provided by Congress.

## IV

The Court of Appeals identified three provisions of the Illinois Act that upset the careful balance struck by Congress and which therefore stand as obstacles to the accomplishment and execution of the full purposes and objectives of Congress. We agree with the Court of Appeals in all essential respects.

## A

The Illinois Act requires a tender offeror to notify the Secretary of State and the target company of its intent to make a

tender offer and the material terms of the offer 20 business days before the offer becomes effective. Ill. Rev. Stat., ch. 121½, ¶¶ 137.54.E, 137.54.B (1979). During that time, the offeror may not communicate its offer to the shareholders. ¶ 137.54.A. Meanwhile, the target company is free to disseminate information to its shareholders concerning the impending offer. The contrast with the Williams Act is apparent. Under that Act, there is no precommencement notification requirement; the critical date is the date a tender offer is "first published or sent or given to security holders." 15 U. S. C. § 78n(d)(1). See also 17 CFR § 240.14d–2 (1981).

We agree with the Court of Appeals that by providing the target company with additional time within which to take steps to combat the offer, the precommencement notification provisions furnish incumbent management with a powerful tool to combat tender offers, perhaps to the detriment of the stockholders who will not have an offer before them during this period.[10] These consequences are precisely what Congress determined should be avoided, and for this reason, the precommencement notification provision frustrates the objectives of the Williams Act.

It is important to note in this respect that in the course of events leading to the adoption of the Williams Act, Congress several times refused to impose a precommencement disclosure requirement. In October 1965, Senator Williams introduced S. 2731, a bill which would have required a bidder to notify the target company and file a public statement with the Securities and Exchange Commission at least 20 days before commencement of a cash tender offer for more than 5% of a class of the target company's securities. 111 Cong. Rec. 28259 (1965). The Commission commented on the bill and stated that "the requirement of a 20-day advance notice to the issuer and the Commission is unnecessary for the protection of security holders . . . ." 112 Cong. Rec. 19005 (1966).

---

[10] See n. 11 and accompanying text, *infra.*

Senator Williams introduced a new bill in 1967, S. 510, which provided for a confidential filing by the tender offeror with the Commission five days prior to the commencement of the offer. S. 510 was enacted as the Williams Act after elimination of the advance disclosure requirement. As the Senate Report explained:

> "At the hearings it was urged that this prior review was not necessary and in some cases might delay the offer when time was of the essence. In view of the authority and responsibility of the Securities and Exchange Commission to take appropriate action in the event that inadequate or misleading information is disseminated to the public to solicit acceptance of a tender offer, the bill as approved by the committee requires only that the statement be on file with the Securities and Exchange Commission at the time the tender offer is first made to the public." Senate Report, at 4.

Congress rejected another precommencement notification proposal during deliberations on the 1970 amendments to the Williams Act.[11]

## B

For similar reasons, we agree with the Court of Appeals

---

[11] H. R. 4285, 91st Cong., 2d Sess. (1970). The bill was not reported out of the Subcommittee. Instead, the Senate amendments to the Williams Act, which did not contain precommencement notification provisions, were adopted. Pub. L. 91–567, 84 Stat. 1497.

The Securities and Exchange Commission has promulgated detailed rules governing the conduct of tender offers. Rule 14d–2(b), 17 CFR § 240.14d–2(b) (1981), requires that a tender offeror make its offer effective within five days of publicly announcing the material terms of the offer by disseminating specified information to shareholders and filing the requisite documents with the Commission. Otherwise the offeror must announce that it is withdrawing its offer. The events in this litigation took place prior to the effective date of Rule 14d–2(b), and because Rule 14d–2(b) operates prospectively only, see 44 Fed. Reg. 70326 (1979), it is not at issue in this case.

that the hearing provisions of the Illinois Act frustrate the congressional purpose by introducing extended delay into the tender offer process. The Illinois Act allows the Secretary of State to call a hearing with respect to any tender offer subject to the Act, and the offer may not proceed until the hearing is completed. Ill. Rev. Stat., ch. 121½, ¶¶ 137.57.A and B (1979). The Secretary may call a hearing at any time prior to the commencement of the offer, and there is no deadline for the completion of the hearing. ¶¶ 137.57.C and D. Although the Secretary is to render a decision within 15 days after the conclusion of the hearing, that period may be extended without limitation. Not only does the Secretary of State have the power to delay a tender offer indefinitely, but incumbent management may also use the hearing provisions of the Illinois Act to delay a tender offer. The Secretary is required to call a hearing if requested to do so by, among other persons, those who are located in Illinois "as determined by post office address as shown on the records of the target company and who hold of record or beneficially, or both, at least 10% of the outstanding shares of any class of equity securities which is the subject of the take-over offer." ¶ 137.57.A. Since incumbent management in many cases will control, either directly or indirectly, 10% of the target company's shares, this provision allows management to delay the commencement of an offer by insisting on a hearing. As the Court of Appeals observed, these provisions potentially afford management a "powerful weapon to stymie indefinitely a takeover." 633 F. 2d, at 494.[12] In enacting the Williams Act, Congress itself "recognized that delay can seriously impede a tender offer" and sought to avoid it. *Great*

---

[12] Delay has been characterized as "the most potent weapon in a tender-offer fight." Langevoort, State Tender-Offer Legislation: Interests, Effects, and Political Competency, 62 Cornell L. Rev. 213, 238 (1977). See also Wachtell, Special Tender Offer Litigation Tactics, 32 Bus. Law. 1433, 1437–1442 (1977); Wilner & Landy, The Tender Trap: State Takeover Statutes and Their Constitutionality, 45 Ford. L. Rev. 1, 9–10 (1976).

*Western United Corp.* v. *Kidwell,* 577 F. 2d 1256, 1277 (CA5 1978); Senate Report, at 4.[13]

Congress reemphasized the consequences of delay when it enacted the Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub. L. 94–435, 90 Stat. 1397, 15 U. S. C. § 12 *et seq.*

> "[I]t is clear that this short waiting period [the 10-day period for proration provided for by § 14(d)(6) of the Securities Exchange Act, which applies only after a tender offer is commenced] was founded on congressional concern that a longer delay might unduly favor the target firm's incumbent management, and permit them to frustrate many pro-competitive cash tenders. This ten-day waiting period thus underscores the basic purpose of the Williams Act—to maintain a neutral policy towards cash tender offers, by avoiding lengthy delays that might discourage their chances for success." H. R. Rep. No. 94–1373, p. 12 (1976).[14]

---

[13] According to the Securities and Exchange Commission, delay enables a target company to:

"(1) repurchase its own securities;

"(2) announce dividend increases or stock splits;

"(3) issue additional shares of stock;

"(4) acquire other companies to produce an antitrust violation should the tender offer succeed;

"(5) arrange a defensive merger;

"(6) enter into restrictive loan agreements; and

"(7) institute litigation challenging the tender offer." Brief for Securities and Exchange Commission as *Amicus Curiae* 10, n. 8.

[14] Representative Rodino set out the consequences of delay in greater detail when he described the relationship between the Hart-Scott-Rodino Act and the Williams Act:

"In the case of cash tender offers, more so than in other mergers, the equities include time and the danger of undue delay. This bill in no way intends to repeal or reverse the congressional purpose underlying the 1968 Williams Act, or the 1970 amendments to that act. . . . Lengthier delays will give the target firm plenty of time to defeat the offer, by abolishing cumulative voting, arranging a speedy defensive merger, quickly incorporating in a State with an antitakeover statute, or negotiating costly lifetime

As we have said, Congress anticipated that investors and the takeover offeror would be free to go forward without unreasonable delay. The potential for delay provided by the hearing provisions upset the balance struck by Congress by favoring management at the expense of stockholders. We therefore agree with the Court of Appeals that these hearing provisions conflict with the Williams Act.

## C

The Court of Appeals also concluded that the Illinois Act is pre-empted by the Williams Act insofar as it allows the Secretary of State of Illinois to pass on the substantive fairness of a tender offer. Under ¶ 137.57.E of the Illinois law, the Secretary is required to deny registration of a takeover offer if he finds that the offer "fails to provide full and fair disclosure to the offerees . . . *or that the take-over offer is inequitable . . .*" (emphasis added).[15] The Court of Appeals understood the Williams Act and its legislative history to indicate that Congress intended for investors to be free to make their own decisions. We agree. Both the House and Senate Reports observed that the Act was "designed to make the relevant facts known so that shareholders have a fair opportunity to make their decision." H. R. Rep. No. 1711, 90th Cong.,

---

employment contracts for incumbent management. And the longer the waiting period, the more the target's stock may be bid up in the market, making the offer more costly—and less successful. Should this happen, it will mean that shareholders of the target firm will be effectively deprived of the choice that cash tenders give to them: Either accept the offer and thereby gain the tendered premium, or reject the offer. Generally, the courts have construed the Williams Act so as to maintain these two options for the target company's shareholders, and the House conferees contemplate that the courts will continue to do so." 122 Cong. Rec. 30877 (1976).

[15] Appellant argues that the Illinois Act does not permit him to adjudicate the substantive fairness of a tender offer. Brief for Appellant 21–22. On this state-law issue, however, we follow the view of the Court of Appeals that ¶ 137.57.E allows the Secretary of State "to pass upon the substantive fairness of a tender offer . . . ." 633 F. 2d 486, 493 (1980).

2d Sess., 4 (1968); Senate Report, at 3. Thus, as the Court of Appeals said, "[t]he state thus offers·investor protection at the expense of investor autonomy—an approach quite in conflict with that adopted by Congress." 633 F. 2d, at 494.

## V

The Commerce Clause provides that "Congress shall have Power . . . [t]o regulate Commerce . . . among the several States." U. S. Const., Art. I, § 8, cl. 3. "[A]t least since *Cooley* v. *Board of Wardens*, 12 How. 299 (1852), it has been clear that 'the Commerce Clause. . . . even without implementing legislation by Congress is a limitation upon the power of the States.'" *Great Atlantic & Pacific Tea Co.* v. *Cottrell*, 424 U. S. 366, 370–371 (1976), quoting *Freeman* v. *Hewitt*, 329 U. S. 249, 252 (1946). See also *Lewis* v. *BT Investment Managers, Inc.*, 447 U. S. 27, 35 (1980). Not every exercise of state power with some impact on interstate commerce is invalid. A state statute must be upheld if it "regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental . . . unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137, 142 (1970), citing *Huron Cement Co.* v. *Detroit*, 362 U. S. 440, 443 (1960). The Commerce Clause, however, permits only *incidental* regulation of interstate commerce by the States; direct regulation is prohibited. *Shafer* v. *Farmers Grain Co.*, 268 U. S. 189, 199 (1925). See also *Pike* v. *Bruce Church, Inc.*, *supra*, at 142. The Illinois Act violates these principles for two reasons. First, it directly regulates and prevents, unless its terms are satisfied, interstate tender offers which in turn would generate interstate transactions. Second, the burden the Act imposes on interstate commerce is excessive in light of the local interests the Act purports to further.

## A

States have traditionally regulated intrastate securities transactions,[16] and this Court has upheld the authority of States to enact "blue-sky" laws against Commerce Clause challenges on several occasions. *Hall* v. *Geiger-Jones Co.*, 242 U. S. 539 (1917); *Caldwell* v. *Sioux Falls Stock Yards Co.*, 242 U. S. 559 (1917); *Merrick* v. *N. W. Halsey & Co.*, 242 U. S. 568 (1917). The Court's rationale for upholding blue-sky laws was that they only regulated transactions occurring within the regulating States. "The provisions of the law . . . apply to dispositions of securities *within* the State and while information of those issued in other States and foreign countries is required to be filed . . . , they are only affected by the requirement of a license of one who deals with them *within* the State. . . . Such regulations affect interstate commerce in [securities] only incidentally." *Hall* v. *Geiger-Jones Co., supra*, at 557–558 (citations omitted). Congress has also recognized the validity of such laws governing intrastate securities transactions in §28(a) of the Securities Exchange Act, 15 U. S. C. §78bb(a), a provision "designed to save state blue-sky laws from pre-emption." *Leroy* v. *Great Western United Corp.*, 443 U. S. 173, 182, n. 13 (1979).

The Illinois Act differs substantially from state blue-sky laws in that it directly regulates transactions which take place across state lines, even if wholly outside the State of Illinois. A tender offer for securities of a publicly held corporation is ordinarily communicated by the use of the mails or other means of interstate commerce to shareholders across the country and abroad. Securities are tendered and transactions closed by similar means. Thus, in this case, MITE

---

[16] For example, the Illinois blue-sky law, Ill. Rev. Stat., ch. 121½, ¶ 137.1 *et seq.* (1979 and Supp. 1980), provides that securities subject to the law must be registered "prior to sale in this State . . . ." ¶ 137.5.

Corp., the tender offeror, is a Delaware corporation with principal offices in Connecticut. Chicago Rivet is a publicly held Illinois corporation with shareholders scattered around the country, 27% of whom live in Illinois. MITE's offer to Chicago Rivet's shareholders, including those in Illinois, necessarily employed interstate facilities in communicating its offer, which, if accepted, would result in transactions occurring across state lines. These transactions would themselves be interstate commerce. Yet the Illinois law, unless complied with, sought to prevent MITE from making its offer and concluding interstate transactions not only with Chicago Rivet's stockholders living in Illinois, but also with those living in other States and having no connection with Illinois. Indeed, the Illinois law on its face would apply even if not a single one of Chicago Rivet's shareholders were a resident of Illinois, since the Act applies to every tender offer for a corporation meeting two of the following conditions: the corporation has its principal executive office in Illinois, is organized under Illinois laws, or has at least 10% of its stated capital and paid-in surplus represented in Illinois. Ill. Rev. Stat., ch. 121½, ¶137.52–10(2) (1979). Thus the Act could be applied to regulate a tender offer which would not affect a single Illinois shareholder.

It is therefore apparent that the Illinois statute is a direct restraint on interstate commerce and that it has a sweeping extraterritorial effect. Furthermore, if Illinois may impose such regulations, so may other States; and interstate commerce in securities transactions generated by tender offers would be thoroughly stifled. In *Shafer* v. *Farmers Grain Co.*, *supra*, at 199, the Court held that "a state statute which by its necessary operation directly interferes with or burdens [interstate] commerce is a prohibited regulation and invalid, regardless of the purpose with which it was enacted." See also *Hughes* v. *Alexandria Scrap Corp.*, 426 U. S. 794, 806 (1976). The Commerce Clause also precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has ef-

fects within the State. In *Southern Pacific Co.* v. *Arizona,*
325 U. S. 761, 775 (1945), the Court struck down on Com-
merce Clause grounds a state law where the "practical effect
of such regulation is to control [conduct] beyond the bound-
aries of the state . . . ." The limits on a State's power to
enact substantive legislation are similar to the limits on the
jurisdiction of state courts. In either case, "any attempt 'di-
rectly' to assert extraterritorial jurisdiction over persons or
property would offend sister States and exceed the inherent
limits of the State's power." *Shaffer* v. *Heitner,* 433 U. S.
186, 197 (1977).

Because the Illinois Act purports to regulate directly and
to interdict interstate commerce, including commerce wholly
outside the State, it must be held invalid as were the laws at
issue in *Shafer* v. *Farmers Grain Co.* and *Southern Pacific.*

## B

The Illinois Act is also unconstitutional under the test of
*Pike* v. *Bruce Church, Inc.,* 397 U. S., at 142, for even when
a state statute regulates interstate commerce indirectly, the
burden imposed on that commerce must not be excessive in
relation to the local interests served by the statute. The
most obvious burden the Illinois Act imposes on interstate
commerce arises from the statute's previously described na-
tionwide reach which purports to give Illinois the power to
determine whether a tender offer may proceed anywhere.

The effects of allowing the Illinois Secretary of State to
block a nationwide tender offer are substantial. Sharehold-
ers are deprived of the opportunity to sell their shares at a
premium. The reallocation of economic resources to their
highest valued use, a process which can improve efficiency
and competition, is hindered. The incentive the tender offer
mechanism provides incumbent management to perform well
so that stock prices remain high is reduced. See Easter-
brook & Fischel, The Proper Role of a Target's Manage-
ment in Responding to a Tender Offer, 94 Harv. L. Rev.

1161, 1173–1174 (1981); Fischel, Efficient Capital Market Theory, the Market for Corporate Control, and the Regulation of Cash Tender Offers, 57 Texas L. Rev. 1, 5, 27–28, 45 (1978); H. R. Rep. No. 94–1373, p. 12 (1976).

Appellant claims the Illinois Act furthers two legitimate local interests. He argues that Illinois seeks to protect resident security holders and that the Act merely regulates the internal affairs of companies incorporated under Illinois law. We agree with the Court of Appeals that these asserted interests are insufficient to outweigh the burdens Illinois imposes on interstate commerce.

While protecting local investors is plainly a legitimate state objective, the State has no legitimate interest in protecting nonresident shareholders. Insofar as the Illinois law burdens out-of-state transactions, there is nothing to be weighed in the balance to sustain the law. We note, furthermore, that the Act completely exempts from coverage a corporation's acquisition of its own shares. Ill. Rev. Stat., ch. 121½, ¶ 137.52–9(4) (1979). Thus Chicago Rivet was able to make a competing tender offer for its own stock without complying with the Illinois Act, leaving Chicago Rivet's shareholders to depend only on the protections afforded them by federal securities law, protections which Illinois views as inadequate to protect investors in other contexts. This distinction is at variance with Illinois' asserted legislative purpose, and tends to undermine appellant's justification for the burdens the statute imposes on interstate commerce.

We are also unconvinced that the Illinois Act substantially enhances the shareholders' position. The Illinois Act seeks to protect shareholders of a company subject to a tender offer by requiring disclosures regarding the offer, assuring that shareholders have adequate time to decide whether to tender their shares, and according shareholders withdrawal, proration, and equal consideration rights. However, the Williams Act provides these same substantive protections, compare Ill. Rev. Stat., ch. 121½, ¶¶ 137.59.C, D, and E (1979) (with-

drawal, proration, and equal consideration rights), with 15 U. S. C. §§ 78n(d)(5), (6), and (7) and 17 CFR § 240.14d–7 (1981) (same). As the Court of Appeals noted, the disclosures required by the Illinois Act which go beyond those mandated by the Williams Act and the regulations pursuant to it may not substantially enhance the shareholders' ability to make informed decisions. 633 F. 2d, at 500. It also was of the view that the possible benefits of the potential delays required by the Act may be outweighed by the increased risk that the tender offer will fail due to defensive tactics employed by incumbent management. We are unprepared to disagree with the Court of Appeals in these respects, and conclude that the protections the Illinois Act affords resident security holders are, for the most part, speculative.

Appellant also contends that Illinois has an interest in regulating the internal affairs of a corporation incorporated under its laws. The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands. See Restatement (Second) of Conflict of Laws § 302, Comment *b*, pp. 307–308 (1971). That doctrine is of little use to the State in this context. Tender offers contemplate transfers of stock by stockholders to a third party and do not themselves implicate the internal affairs of the target company. *Great Western United Corp.* v. *Kidwell*, 577 F. 2d, at 1280, n. 53; Restatement, *supra*, § 302, Comment *e*, p. 310. Furthermore, the proposed justification is somewhat incredible since the Illinois Act applies to tender offers for any corporation for which 10% of the outstanding shares are held by Illinois residents, Ill. Rev. Stat., ch. 121½, ¶ 137.52–10 (1979). The Act thus applies to corporations that are not incorporated in Illinois and have their principal place of business in other States. Illinois has no inter-

est in regulating the internal affairs of foreign corporations.

We conclude with the Court of Appeals that the Illinois Act imposes a substantial burden on interstate commerce which outweighs its putative local benefits. It is accordingly invalid under the Commerce Clause.

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE POWELL, concurring in part.

I agree with JUSTICE MARSHALL that this case is moot. In view, however, of the decision of a majority of the Court to reach the merits, I join Parts I and V–B of the Court's opinion.

I join Part V–B because its Commerce Clause reasoning leaves some room for state regulation of tender offers. This period in our history is marked by conglomerate corporate formations essentially unrestricted by the antitrust laws. Often the offeror possesses resources, in terms of professional personnel experienced in takeovers as well as of capital, that vastly exceed those of the takeover target. This disparity in resources may seriously disadvantage a relatively small or regional target corporation. Inevitably there are certain adverse consequences in terms of general public interest when corporate headquarters are moved away from a city and State.*

The Williams Act provisions, implementing a policy of neutrality, seem to assume corporate entities of substantially equal resources. I agree with JUSTICE STEVENS that the

---

*The corporate headquarters of the great national and multinational corporations tend to be located in the large cities of a few States. When corporate headquarters are transferred out of a city and State into one of these metropolitan centers, the State and locality from which the transfer is made inevitably suffer significantly. Management personnel—many of whom have provided community leadership—may move to the new corporate headquarters. Contributions to cultural, charitable, and educational life—both in terms of leadership and financial support—also tend to diminish when there is a move of corporate headquarters.

Williams Act's neutrality policy does not necessarily imply a congressional intent to prohibit state legislation designed to assure—at least in some circumstances—greater protection to interests that include but often are broader than those of incumbent management.

JUSTICE STEVENS, concurring in part and concurring in the judgment.

The question whether this case is moot depends on the effect of the preliminary injunction entered on February 2, 1979, restraining the Illinois Secretary of State from enforcing the Illinois Business Take-Over Act while the injunction remained in effect. If, as JUSTICE MARSHALL contends in his dissenting opinion, the injunction granted the MITE Corp. a complete immunity from state sanctions for any acts performed while the injunction was outstanding, I would agree that the case is moot. On the other hand, if the injunction did no more than it purported to do, setting aside the injunction would remove its protection and MITE would be subject to sanctions in the state courts. Those courts might regard the fact that an injunction was outstanding at the time MITE violated the Illinois statute as a defense to any enforcement proceeding, but unless the federal injunction was tantamount to a grant of immunity, there is no federal rule of law that would require the state courts to absolve MITE from liability. I believe, therefore, that to resolve the mootness issue—which, of course, is jurisdictional—we must answer the question that JUSTICE MARSHALL's dissent raises.

JUSTICE MARSHALL advances various reasons for adopting a rule that will give federal judges the power to grant complete immunity to persons who desire to test the constitutionality of a state statute. His proposed rule would treat any federal judge's preliminary injunction restraining enforcement of a state statute on federal grounds as a grant of immunity with respect to any conduct undertaken while the injunc-

tion was outstanding. Under the rule he proposes, "if the statute is later determined to be valid, the State will never be able to prosecute the individual that obtained the preliminary injunction for action taken while the injunction was in effect." *Post,* at 657, n. 1. For me, the question is not whether such a rule would be wise; the question is whether federal judges possess the power to grant such immunity. In my opinion they do not.

I

The essential facts of this case are few and bear repeating. On February 2, 1979, MITE Corp. and MITE Holdings, Inc., obtained a preliminary injunction restraining the Illinois Secretary of State from invoking the provisions of the Illinois Business Take-Over Act to block MITE's intended takeover of Chicago Rivet & Machine Co. Three days later, without complying with the provisions of the Illinois statute, MITE published its offer in the Wall Street Journal. On February 9, 1979, the District Court entered a judgment declaring the Illinois statute unconstitutional; the court permanently enjoined the Secretary from enforcing the Illinois statute against MITE.

The State contends that the attempted takeover was subject to the provisions of the Illinois statute and that MITE violated the Act by failing to register with the Illinois Secretary of State. The State further argues that the Take-Over Act is consistent with federal law. For purposes of deciding the mootness issue, we must assume that these contentions are correct; a holding that this case is moot would mean that MITE is completely protected from any adverse action whether or not the statute is unconstitutional. Such a conclusion would be possible only if the District Court's preliminary injunction granted MITE absolute and permanent immunity from any prosecution—civil or criminal—brought to enforce the Illinois statute.

Neither the terms of the preliminary injunction nor prior equity practice provides any support for an interpretation of

the District Court's order as a grant of total immunity from future prosecution. More fundamentally, federal judges have no power to grant such blanket dispensation from the requirements of valid legislative enactments.

## A

An injunction restrains conduct. Its effect is normally limited to the parties named in the instrument. Since a preliminary injunction may be granted on a mere probability of success on the merits, generally the moving party must demonstrate confidence in his legal position by posting bond in an amount sufficient to protect his adversary from loss in the event that future proceedings prove that the injunction issued wrongfully.[1] The bond, in effect, is the moving party's warranty that the law will uphold the issuance of the injunction.

These features of injunctive relief are inconsistent with a blanket grant of immunity, as this case demonstrates. The preliminary injunction did not purport to provide permanent immunity for violations of the statute that occurred during its effective period. It merely provided that the Secretary of State was enjoined from "issuing any cease and desist order or notice of hearing or from otherwise invoking, applying, or enforcing the Illinois Business Take-Over Act" against MITE. Record 16. It did not enjoin other parties who are authorized by the Act to enforce its provisions. Ill. Rev.

---

[1] As provided by Federal Rule of Civil Procedure 65(c):

"No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of an officer or agency thereof."

In Illinois damages apparently may be recovered for injuries caused by a preliminary injunction issued wrongfully by a state court even in the absence of an indemnity bond or abuse of process. See Ill. Rev. Stat., ch. 69, ¶ 12 (1979); Note, 73 Harv. L. Rev. 333, 347 (1959).

Stat., ch. 121½, ¶¶ 137.62, 137.64 (1979).   Moreover, the pre-
liminary injunction was entered without any declaration that
the Illinois statute was unconstitutional.   There simply is no
basis on which to conclude that the preliminary injunction
issued by the District Court should be construed as having
granted MITE permanent immunity from future proceedings
brought under the Illinois statute.

In *Steffel* v. *Thompson*, 415 U. S. 452, the Court unani-
mously held that an individual who wished to engage in "con-
stitutionally protected activity" but was threatened with
prosecution under a state criminal statute could obtain a
declaratory judgment in federal court declaring the statute
invalid.   The Court did not suggest that, armed with such a
judgment from a federal district court, the individual could
violate the statute with impunity; indeed, it stated just the
opposite:

> "'[A] federal declaration of unconstitutionality reflects
> the opinion of the federal court that the statute cannot be
> fully enforced.   If a declaration of total unconstitutional-
> ity is affirmed by this Court, it follows that this Court
> stands ready to reverse any conviction under the stat-
> ute.'"   *Id.*, at 469–470 (quoting *Perez* v. *Ledesma*, 401
> U. S. 82, 124 (separate opinion of BRENNAN, J.)).[2]

JUSTICE WHITE attached possibly the greatest significance to
a federal declaratory judgment, writing separately in *Steffel*
that "I would anticipate that a final declaratory judgment en-
tered by a federal court holding particular conduct of the fed-
eral plaintiff to be immune on federal constitutional grounds
from prosecution under state law should be accorded res
judicata effect in any later prosecution of that very conduct."

---

[2] See also 415 U. S., at 480 (REHNQUIST, J., concurring) ("There is
nothing in the [Declaratory Judgment] Act's history to suggest that Con-
gress intended to provide persons wishing to violate state laws with a fed-
eral shield behind which they could carry on their contemplated conduct");
*id.*, at 482 ("A declaratory judgment is simply a statement of rights, not a
binding order supplemented by continuing sanctions").

415 U. S., at 477 (concurring opinion).   A declaratory judg-
ment reversed on appeal, however, certainly would not have
such res judicata effect.

An individual who is imminently threatened with prosecu-
tion for conduct that he believes is constitutionally protected
should not be forced to act at his peril.   One purpose of the
federal declaratory judgment statute is to permit such an
individual to test the legality of a state statute before engag-
ing in conduct that is prohibited by its terms.   See S. Rep.
No. 1005, 73d Cong., 2d Sess., 2–3 (1934).   Recognition of
this fact, however, does not determine the point at which an
individual may act with absolute assurance that he may not be
punished for his contemplated activity.   The fact that a fed-
eral judge has entered a declaration that the law is invalid
does not provide that assurance; every litigant is painfully
aware of the possibility that a favorable judgment of a trial
court may be reversed on appeal.   To repeat the words of
this Court in *Steffel*, the most that can be said is: " 'If a dec-
laration of total unconstitutionality is affirmed by this Court,
it follows that this Court stands ready to reverse any convic-
tion under the statute.' "   415 U. S., at 470 (quoting *Perez* v.
*Ledesma, supra,* at 124 (separate opinion of BRENNAN, J.)).[3]

Since a final judgment declaring a state statute unconstitu-
tional would not grant immunity for actions taken in reliance
on the court's decision, certainly a preliminary injunction—
which on its face does nothing more than temporarily restrain
conduct—should not accomplish that result.   Neither the

---

[3] The fact that an unreviewed judgment does not provide absolute protec-
tion does not render the declaratory judgment of a district court or a court
of appeals meaningless.   As stated in *Steffel:*

" 'Even where a declaration of unconstitutionality is not reviewed by this
Court, the declaration may still be able to cut down the deterrent effect of
an unconstitutional state statute.   The persuasive force of the court's opin-
ion and judgment may lead state prosecutors, courts, and legislators to re-
consider their respective responsibilities toward the statute.   Enforce-
ment policies or judicial construction may be changed, or the legislature
may repeal the statute and start anew.' "   415 U. S., at 470 (quoting *Perez*
v. *Ledesma,* 401 U. S., at 125 (separate opinion of BRENNAN, J.)).

preliminary injunction nor the subsequent judgment declaring the statute unconstitutional can fairly be construed as a grant of absolute immunity from enforcement of the Illinois statute.[4]

## B

My conclusions concerning the proper nature of injunctive and declaratory relief are not based upon arcane interpreta-

---

[4] In *Liner* v. *Jafco, Inc.*, 375 U. S. 301, the respondent obtained an injunction from a state court that restrained picketing at a construction site. Petitioners moved to dissolve the injunction on the ground that the state court was without jurisdiction to adjudicate the controversy because the subject matter of the picketing was exclusively within the cognizance of the National Labor Relations Board. Petitioners' motion was denied by the state court and that decision was affirmed on appeal. This Court granted a petition for certiorari.

While the case was pending in the state appellate court, construction at the site was completed. This Court nevertheless held that the issue of whether the injunction had issued properly was not moot because the respondent remained liable on an indemnity bond if the injunction had issued wrongfully. The Court stated:

"The petitioners plainly have 'a substantial stake in the judgment . . . ,' *Fiswick* v. *United States,* 329 U. S. 211, 222, which exists apart from and is unaffected by the completion of construction. Their interest derives from the undertaking of respondent Jafco, Inc., in the injunction bond to indemnify them in damages if the injunction was 'wrongfully' sued out. Whether the injunction was wrongfully sued out turns solely upon the answer to the federal question which the petitioners have pressed from the beginning. If the answer of the Tennessee Court of Appeals to that question may not be challenged here, the petitioners have no recourse against Jafco on the bond." *Id.,* at 305–306.

In this case it does not appear that MITE is liable on an injunction bond. The posting of an indemnity bond, however, merely creates a right of action—that may or may not otherwise exist—for damages caused during the period that a wrongfully issued injunction was in effect. In this case, such rights of action exist under an independent state law that we must presume to be valid. As in *Liner,* these rights of action may be pursued "if the injunction was 'wrongfully' sued out"; and "[w]hether the injunction was wrongfully sued out turns solely upon the answer to the federal question which the petitioners have pressed from the beginning."

tions of common law. Federal courts are courts of limited jurisdiction.[5] Before a federal court exercises any governmental power, it has a duty to determine its own jurisdiction to act. There simply is no constitutional or statutory authority that permits a federal judge to grant dispensation from a valid state law.[6]

As I have written before, the federal judiciary can continue to perform its vital function in our governmental structure only if it recognizes the limitations on its own legitimate authority. *United States* v. *New York Telephone Co.*, 434 U. S. 159, 178 (STEVENS, J., dissenting in part). A belief that a particular result appears reasonable or wise is an insufficient predicate for the exercise of federal judicial power.

---

[5] As stated by Chief Justice Marshall in *Ex parte Bollman*, 4 Cranch 75, 93:

"As preliminary to any investigation of the merits of this motion, this court deems it proper to declare that it disdains all jurisdiction not given by the constitution, or by the laws of the United States.

"Courts which originate in the common law possess a jurisdiction which must be regulated by the common law, until some statute shall change their established principles; but courts which are created by written law, and whose jurisdiction is defined by written law, cannot transcend that jurisdiction. It is unnecessary to state the reasoning on which this opinion is founded, because it has been repeatedly given by this court; and with the decisions heretofore rendered on this point, no member of the bench has, even for an instant, been dissatisfied."

[6] I do not suggest that, if the state law is valid, a federal court lacks jurisdiction to enter an injunction restraining state officials from enforcing the statute. Such an injunction may be appropriate—and would be binding on the parties—to permit the federal court to preserve its jurisdiction pending a final decision on the constitutionality of the statute. *United States* v. *Mine Workers*, 330 U. S. 258, 289-290. "Although only temporary, the injunction does prohibit state and local enforcement activities against the federal plaintiff pending final resolution of his case in the federal court." *Doran* v. *Salem Inn, Inc.*, 422 U. S. 922, 931. Such an injunction does not *continue* to be binding on the parties, however, if it is vacated on appeal; "an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties *until it is reversed by orderly and proper proceedings.*" *United States* v. *Mine Workers, supra*, at 293 (emphasis added).

The District Court in this case entered both an injunction restraining certain conduct by the Illinois Secretary of State and a judgment declaring a state statute unconstitutional. It did not—because it could not—grant immunity from the requirements of a valid state law.[7]  As a result, this Court has jurisdiction to consider whether the judgment and relief entered by the District Court were proper.[8]

## II

On the merits, I agree with the Court that the Illinois Take-Over Act is invalid because it burdens interstate com-

---

[7] A conflict between a federal rule of law and a state statute may nullify the state law.  Although such invalidity may not be recognized or accepted until it is identified in litigation, in my opinion the conflict with a paramount rule of federal law nullifies a state law whether or not litigation is ever commenced.  In other words, it is federal rules of law—and not the actions of federal judges—that may render a state law invalid.

[8] JUSTICE REHNQUIST concludes that this case is moot because the injunction restrains an enforcement proceeding that has not yet begun.  If his view were accepted, an injunction against a threatened criminal proceeding, see *Dombrowski* v. *Pfister*, 380 U. S. 479, would never be appropriate, for the controversy between the parties would not yet be "ripe." MITE sought an injunction not only to prevent the Illinois Secretary of State from interfering with its attempted takeover of Chicago Rivet, but also to bar the Secretary from proceeding against MITE for actions taken in violation of the statute.  What is critical to the mootness question in this case is not that MITE abandoned the takeover before it was completed, but that MITE engaged in conduct that violated the terms of the Illinois statute.  The *extent* of MITE's violation of state law cannot be determinative of its interest in avoiding an enforcement proceeding based on what MITE believed was constitutionally protected activity.

*Oil Workers* v. *Missouri*, 361 U. S. 363, relied on by JUSTICE REHNQUIST, does not compel a contrary result.  In that case, the party subject to the injunction terminated the activity that had been enjoined.  As a result, this Court refused to consider whether the injunction had issued properly, even though a resolution of that question would also have resolved other matters—based on similar questions of law—pending in another proceeding between the same parties.  In this case, the party subject to the injunction—the Illinois Secretary of State—has not abandoned his desire to do what the injunction currently restrains him from doing.

merce. I therefore join Part V of its opinion. I am not persuaded, however, that Congress' decision to follow a policy of neutrality in its own legislation is tantamount to a federal prohibition against state legislation designed to provide special protection for incumbent management. Accordingly, although I agree with the Court's assessment of the impact of the Illinois statute, I do not join its pre-emption holding.

JUSTICE O'CONNOR, concurring in part.

I agree with the Court that the case is not moot, and that portions of the Illinois Business Take-Over Act, Ill. Rev. Stat., ch. 121½, ¶ 137.51 *et seq.* (1979), are invalid under the Commerce Clause. Because it is not necessary to reach the pre-emption issue, I join only Parts I, II, and V of the Court's opinion, and would affirm the judgment of the Court of Appeals on that basis.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

The jurisdiction of this Court depends upon the existence of a live controversy. We may resolve a particular dispute only if the parties have a real interest in the outcome of that dispute. Otherwise, the case is moot, and must be dismissed. *Roe* v. *Wade*, 410 U. S. 113, 125 (1973); *SEC* v. *Medical Committee for Human Rights*, 404 U. S. 403, 407 (1972). In my view, this case should have been dismissed. The parties to this appeal have no adversary interest in the outcome of this case. Their positions would be the same whether the Court approved the Illinois Business Take-Over Act or struck it down. Because the Court finds that the Illinois Act is unconstitutional, there will be no further litigation. However, even if the Court had held that the Illinois Act is constitutional, and had lifted the permanent injunction that now restrains enforcement of the Act against MITE, there would be no basis for continued litigation. The Secretary stated that if the decision below were reversed, he would initiate enforcement proceedings against MITE in

state court, seeking civil and criminal penalties for its failure to comply with the Illinois Act. But a preliminary injunction was in effect at the time the alleged violations occurred. As I explain below, I believe that this injunction would have barred the Secretary from seeking either civil or criminal penalties for violations of the Act that occurred during that period. MITE would have a complete defense to such an action.

## I

The Secretary argues that the case is not moot because the preliminary injunction would not be a complete defense to a state enforcement action. He contends that the preliminary injunction merely barred him from commencing an enforcement action during the period the injunction was in effect. Thus, if this Court had decided that the statute is constitutional and had lifted the permanent injunction, the State would have been able to commence an action seeking penalties for any violations that occurred during the period the preliminary injunction was in effect. In other words, argues the Secretary, the preliminary injunction only provided temporary security. It enabled MITE to go forward with the tender offer—subject to the risk that at some later stage, the constitutionality of the statute would be upheld, and the State would commence enforcement proceedings.

Federal courts undoubtedly have the power to issue a preliminary injunction that restrains enforcement of a state statute, subject to the condition that if the statute is later found to be valid, the State is free to seek penalties for violations that occurred during the period the injunction was in effect. In my view, however, federal courts also have the power to issue a preliminary injunction that offers permanent protection from penalties for violations of the statute that occurred during the period the injunction was in effect.[1] Determining

---

[1] Unless the federal courts can grant preliminary injunctions that provide permanent protection, challenges to questionable state statutes may be de-

whether a particular injunction provides temporary or permanent protection becomes a question of interpretation.

I believe that in the ordinary case, unless the order contains specific language to the contrary, it should be presumed that an injunction secures permanent protection from penalties for violations that occurred during the period it was in effect; the burden should be on the State to show that the injunction provided only temporary security.[2] A presumption

---

terred. A state statute may be either repugnant to the Constitution, or pre-empted by some federal law. Parties who wish to engage in conduct proscribed by state statutes may be reluctant to challenge their validity unless they can obtain permanent immunity from penalties. But there is a strong federal interest in encouraging such challenges: the Constitution itself provides that the Constitution and federal statutes shall be "the supreme Law of the Land." Grants of permanent immunity help ensure that federal law will remain paramount.

Holding that federal courts have power to grant permanent protection would not substantially limit state power. In fact, the impact on state power will be relatively insignificant. A federal court may grant a preliminary injunction prohibiting the enforcement of a state statute only when there is substantial doubt about the validity of the statute, and when the party seeking relief is able to show that he will suffer irreparable injury if an injunction is not granted. It is true that under the rule I propose, if the statute is later determined to be valid, the State will never be able to prosecute the individual that obtained the preliminary injunction for action taken while the injunction was in effect. However, the State will be free to prosecute him for actions occurring either before or after the injunction, and will also be able to prosecute other persons who violated the statute. In other words, the State will be barred only from prosecuting the particular individual who requested the injunction for conduct undertaken during the pendency of the injunction. Moreover, it will be barred from prosecuting that individual, only because there was serious doubt about the constitutionality of the statute, and because he was able to show that he would suffer irreparable injury if an injunction was not granted.

[2] It might be argued that because a party seeking a preliminary injunction must ordinarily post bond, there should be a presumption in favor of recovery of damages caused by a wrongfully issued preliminary injunction. However, the fact that an injunction bond is ordinarily required does not necessarily imply that the party against whom the injunction was issued is automatically entitled to damages. That party must still prove that dam-

in favor of permanent protection is likely to reflect the intentions of the court that granted the motion. In acting upon a request for an injunction, it will recognize that short-term protection is often only marginally better than no protection at all. Parties seek to restrain the enforcement of a state statute, not just because they want short-term protection, but because they desire permanent immunity for actions they take in reliance on the injunction. If they are contemplating action that might violate a state statute, they will take little solace from temporary immunity—when they know that if they decide to act, enforcement proceedings might be initiated at some later stage.[3]

---

ages are appropriate; the injunction bond merely provides security, when the party is able to make such a showing.

It is true that when an injunction bond has been posted, and when the party challenging the injunction has a right to recover damages on the bond, the question whether an injunction was properly issued is not moot. See *Liner* v. *Jafco, Inc.*, 375 U. S. 301 (1964). The District Court record does not reveal that a bond was posted in this case. Even if a bond had been posted, however, this case would probably be moot; I believe that the State would not have a cause of action for damages. If this Court had determined that the injunction was wrongfully entered, the State might argue that it was damaged because it was unable to recover penalties for violations of the Take-Over Act that occurred during the period the preliminary injunction was in effect. Such an argument should not prevail. Lost penalties do not constitute the sort of damages recoverable on a bond. In any event, as I suggest in this dissent, I believe that the preliminary injunction should be interpreted as protecting MITE from penalties. Thus, it should also protect MITE from liability for "damages" sustained by the State because it could not bring an action for penalties.

If a bond had been posted, the State might be able to recover costs or nominal damages on the bond. However, where there is no other basis for challenging the validity of an injunction, the possibility of such recovery is not sufficient to keep a case alive. If it were, then almost no case challenging an injunction could become moot. See *Washington Market Co.* v. *District of Columbia*, 137 U. S. 62 (1890) (court costs); *Hernandez* v. *European Auto Collision, Inc.*, 487 F. 2d 378, 387 (CA2 1973) (nominal damages); *Kerrigan* v. *Boucher*, 450 F. 2d 487 (CA2 1971) (nominal damages).

[3] Cf. *Steffel* v. *Thompson*, 415 U. S. 452, 462 (1974) (federal-court intervention is appropriate where the applicant for relief is situated "between

Here, the preliminary injunction does not expressly state that it provides permanent immunity from penalties for violations of the Illinois Act that may occur during its effective period. The injunction provides only that the Secretary of State is enjoined from "issuing any cease and desist order or notice of hearing or from otherwise invoking, applying, or enforcing the Illinois Business Take-Over Act" against MITE. Record 16. However, I see no reason why the presumption in favor of permanent protection should not be applied here. In this context, as the District Court must have recognized, permanent protection was needed. MITE sought an injunction, not just because it desired protection from enforcement actions during the period it was actually making the tender offer, but also because it desired protection from such actions in the future. The Act provides for substantial civil and criminal penalties. MITE would have been reluctant to go forward with its offer, which entailed considerable expense, if there were some risk that it would be penalized later. Indeed, in the Schedule 14D-1 filed with the SEC, MITE expressly stated that it would not commence the tender offer unless it obtained injunctive relief. It also reserved the right to withdraw its offer if injunctive relief were initially granted, but later withdrawn. See Record, Plaintiff's Exhibit 14.[4]

---

the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding"). See also *Hygrade Provision Co.* v. *Sherman*, 266 U. S. 497, 500 (1925); *Terrace* v. *Thompson*, 263 U. S. 197, 216 (1923); *Salem Inn, Inc.* v. *Frank*, 501 F. 2d 18, 21 (CA2 1974), aff'd in relevant part *sub nom. Doran* v. *Salem Inn, Inc.*, 422 U. S. 922 (1975).

[4] I also find it significant that the District Court's final order granting a permanent injunction declares that the Illinois Act is "null and void and of no force and effect." App. to Juris. Statement 41a. A reasonable construction of the order granting a preliminary injunction is that it was also intended to render the act "null and void" while the injunction was in effect.

Interpreting the injunction to provide permanent protection also ensures that MITE could never be penalized for acting in reliance on the injunction.[5] MITE went forward with the tender offer, reasonably believing that the District Court's order provided complete immunity. Under the circumstances, it would be improper to permit the State to penalize action taken while the injunction was in effect. In the past, this Court has recognized that reasonable reliance on judicial pronouncements may constitute a valid defense to criminal prosecution. See, e. g., *Marks* v. *United States*, 430 U. S. 188 (1977).[6]

In addition to arguing that the preliminary injunction should be interpreted to provide only temporary protection from a state enforcement action, the Secretary argues that resolution of the mootness issue in this case should be controlled by *Leroy* v. *Great Western United Corp.*, 443 U. S. 173 (1979). In that case, Great Western announced its intention to make a tender offer to purchase stock in another corporation. Idaho officials responsible for administering an Idaho statute governing corporate takeovers, see Idaho Code § 30–1501 *et seq.* (1980), objected to the offer and delayed its effective date. Great Western brought an action in

---

[5] It is relevant to note that although MITE sought injunctive relief prior to engaging in any action that could subject it to civil or criminal penalties, the State never sought a stay of the District Court's injunction either in that court or in the Court of Appeals, and never expressed an intent to do so.

[6] In *Marks*, a conviction for transporting obscene materials was overturned, where the materials were not obscene at the time of transportation, but were rendered obscene at the time of trial by an intervening decision of this Court. See also *Cox* v. *Louisiana*, 379 U. S. 559, 569–571 (1965) (conviction for illegal picketing reversed where defendant had relied on permission from police officer); *Raley* v. *Ohio*, 360 U. S. 423, 437–439 (1959) (conviction for refusal to testify before state commission reversed because witness had relied on opinion of commission chairman that he was privileged to remain silent); *United States* v. *Mancuso*, 139 F. 2d 90 (CA3 1943) (defendant could not be held liable for ignoring induction notices issued while *ex parte* order staying induction was in effect).

Federal District Court, seeking a declaration that the Idaho takeover law was unconstitutional, and an injunction restraining Idaho officials from enforcing the statute. The District Court granted injunctive relief that enabled Great Western to complete the acquisition. This Court, in reviewing the case, held that the controversy was not moot. "[T]he question whether Great Western has violated Idaho's statute will remain open unless and until the District Court's judgment is finally affirmed." *Id.*, at 178.[7]

*Leroy* v. *Great Western United Corp.* is easily distinguishable from this case. Unlike MITE, Great Western took actions that might have violated the state takeover statute before it obtained injunctive relief. If this Court had decided that the Idaho statute was valid, Idaho officials might have been able to seek penalties for those preinjunction violations.[8] *Leroy* v. *Great Western United Corp.* can also be distinguished on the ground that the takeover offer in that case was successful. If the Idaho statute had been found to be valid, then Idaho officials would have been able to seek a rescission of the takeover.[9] Here, since the acquisition was never completed, Illinois officials could not seek rescission.[10]

---

[7] The Court did not reach the question whether the Idaho statute was unconstitutional. It concluded that the action should have been dismissed on grounds of improper venue.

[8] See Idaho Code §§ 30–1502 to 30–1504, 30–1510 (1980).

[9] See Idaho Code § 30–1509 (1980) (allowing State to institute action for rescission). The Illinois Act also empowers the State to seek a court order rescinding sales that are unlawful under the Act. Ill. Rev. Stat., ch. 121½, ¶ 137.62 (1979).

[10] It is true that a rescission action would have been predicated on acts that were taken under cover of the preliminary injunction. However, I believe that injunctions should ordinarily be interpreted only as providing permanent protection from *penalties*. The State should be barred from penalizing the offeror for acts that took place during the period the injunction was in effect. However, if a court determines that the state statute is valid, the State should be free to provide a remedy for the continuing effects of acts that violated the statute. In particular, a State should be permitted to dismantle a successful acquisition that violated a valid statute.

Finally, this case does not fall within the exception to the mootness doctrine for cases that "are capable of repetition, yet evading review." Unless a class action is involved, that exception applies only when the challenged action is too short to be fully litigated before its cessation, and when there is a reasonable expectation or a demonstrated probability that the same complaining party will be subject to the same action in the future. *Illinois State Board of Elections* v. *Socialist Workers Party*, 440 U. S. 173, 187 (1979); *Weinstein* v. *Bradford*, 423 U. S. 147, 149 (1975). The second requirement has not been satisfied here. MITE has agreed not to renew its efforts to acquire Chicago Rivet. Thus, unless MITE breaches its agreement,[11] the State will never again have occasion to prevent MITE from making a takeover offer for Chicago Rivet. In addition, there has been no showing that MITE plans to acquire another corporation with substantial connection to Illinois. Thus, there is no demonstrated probability that the State will have occasion to prevent MITE from making a takeover offer for some other corporation.

## II

The majority disposes of the mootness issue in a short paragraph. It concedes that the only possible basis for continued litigation in this case would be a state action for penalties. It further concedes that the preliminary injunction issued by the District Court may be a complete defense to an action for civil or criminal penalties. It argues, however, that the effect to be given the preliminary injunction should not be reached in this case. Rather, that question should be decided in a state enforcement action, if it is raised as a defense. Thus, contends the majority, the case is not moot.

---

[11] The possibility that MITE will breach its agreement does not bring this case within the "capable of repetition, yet evading review" exception. The likelihood that such a breach will occur is relatively small. The exception applies only when there is a reasonable expectation that the same action will occur in the future.

I am completely unpersuaded by the majority's facile analysis. In deciding whether a case is moot, the Court must determine whether there is a live controversy. There is a live controversy in this case only if the State could seek penalties from MITE. Here, the State could not seek penalties from MITE. It may be true that the State could file a complaint if this Court were to lift the permanent injunction. However, this fact is not enough to keep the case alive where, as a matter of federal law, the complaint *must* be dismissed. If the action that the State plans to commence in state court lacks any merit—if MITE has an automatic defense to that action—then there simply is no controversy.

This case is made more difficult because the Court has never before decided what effect should be given to preliminary injunctions. But the fact that we must decide a novel question does not make the case any less moot. Certainly, if the Court had already held that a preliminary injunction provides permanent immunity, the case would be moot even though the State could go into state court and seek penalties. Such a suit, which would be clearly frivolous, could not keep the dispute alive.

The Court's refusal to confront the question whether a preliminary injunction would provide a complete defense is particularly ironic, given its recent decision in *Lane* v. *Williams*, 455 U. S. 624 (1982). Respondents in that case had pleaded guilty in unrelated Illinois state-court prosecutions for burglary, an offense punishable by imprisonment and a mandatory 3-year parole term. Neither respondent was informed during his plea acceptance hearing that the negotiated sentence included the mandatory parole term. Each respondent completed his prison sentence but was reincarcerated for parole violation. While in custody, they filed petitions for federal habeas corpus, alleging that their guilty pleas were invalid because they were not informed of the mandatory parole requirement. The District Court decided to enter an order declaring the parole term void, and the United States

Court of Appeals for the Seventh Circuit affirmed. By the time the cases reached this Court, both respondents had completed their sentences, and their parole terms had expired. This Court held that the claims for relief were moot. In reaching this conclusion, the Court determined that as a matter of Illinois law, no collateral consequences would flow from the parole revocations. Thus, there would be no point in declaring the parole terms void. In other words, the Court reached out to decide a question of state law in order to hold that the case was moot. Here, by contrast, the Court refuses to confront an important question of *federal* law—deciding instead that the question should be left to a state court—so that it can avoid holding that the case is moot.

## III

The parties to this appeal have no adversary interest in the resolution of the merits of this controversy. The majority acts without jurisdiction when it addresses the question whether the Illinois Business Take-Over Act is constitutional. Because I believe the case is moot, I would have vacated the judgment of the Court of Appeals, with instructions that it remand the case to the District Court with instructions to dismiss.

JUSTICE REHNQUIST, dissenting.

I agree with JUSTICE MARSHALL that this case does not present a justiciable controversy, but for a different reason.

MITE obtained an injunction in order to effect a cash tender offer for the stock of Chicago Rivet. The injunction restrained the Illinois Secretary of State from interfering with the Chicago Rivet tender offer by enforcing the Illinois Business Take-Over Act against MITE. Three days after the District Court issued a permanent injunction, MITE and Chicago Rivet reached an agreement and MITE withdrew its extant offer. Approximately one month later, MITE announced its decision not to make any tender offer. MITE is

not presently engaging in activity that is regulated by the Illinois statute, and there is no indication that MITE intends to engage in any such activity in the future. Therefore, the facts that gave rise to *this controversy* over the constitutionality of Illinois' anti-takeover statutes no longer exist, and it is unlikely that they will be repeated in the future. As the tender offer has met its demise for reasons having nothing to do with the validity of the Illinois statute, the injunction is no longer necessary to accomplish the purposes for which it was obtained. MITE no longer needs an injunction in order to effect a tender offer for the shares of Chicago Rivet or any other corporation subject to the Illinois Act. Nor does MITE need the injunction in order to preclude the Secretary from rescinding a completed tender offer.

Despite these developments which have occurred after the District Court issued the injunction, the Court concludes that the present controversy between the Illinois Secretary of State and MITE over the constitutionality of the Illinois Business Take-Over Act is not moot. According to the Court, the Illinois Secretary of State's intention to bring an enforcement action against MITE keeps the present controversy alive. The possibility of a future enforcement action, however, is insufficient for me to conclude that the controversy that is before the Court is not moot.[1]

This Court has no power over a suit not pending before it. "'Our power only extends over and is limited by the conditions of the case now before us.'" *Oil Workers* v. *Missouri*, 361 U. S. 363, 370 (1960), quoting *American Book Co.* v. *Kansas ex rel. Nichols*, 193 U. S. 49, 52 (1904). A case pending in this Court may not be kept alive simply because similar or identical issues are currently ripe for decision in a controversy between the same parties in another court. See *Oil*

---

[1] This case is unlike those in which this Court has found justiciable an action to enjoin a threatened criminal prosecution. The plaintiff in the present posture of this case no longer intends to engage in, or is presently engaging in, what is asserted to be federally protected activity.

*Workers* v. *Missouri, supra,* at 370–371; *American Book Co.* v. *Kansas ex rel. Nichols, supra,* at 51. *A fortiori,* this case may not be kept alive simply because there may exist a presently unripened controversy between these same parties over the constitutionality of the same Act. This is so even if our resolution of the merits of the instant case will resolve certain defenses that MITE could raise in an enforcement action were one to be brought by the Secretary. It follows that this case is not alive simply because a decision on the merits in this case will determine whether or not the Secretary's threatened enforcement action may ever ripen into a live controversy.

If an enforcement action were brought by the Secretary, "there is no way to know what the outcome of such a proceeding in the [Illinois] courts might be." *Oil Workers* v. *Missouri, supra,* at 371. The Illinois courts may well conclude that the injunction constitutes a defense either on state law grounds or upon the grounds suggested by JUSTICE MARSHALL in his dissent. The Illinois courts may also agree with MITE that the Business Take-Over Act is pre-empted by the Williams Act or that Illinois' regulation of interstate tender offers runs afoul of the Commerce Clause. The possibility that this Court might disagree with the Illinois courts' ultimate resolution of the issues arising in a presently unripe, but threatened, enforcement action hardly justifies the Court's resolution of important constitutional issues in the abstract posture in which they are currently presented.[2]

---

[2] *Bus Employees* v. *Missouri,* 374 U. S. 74 (1963), and *Super Tire Engineering Co.* v. *McCorkle,* 416 U. S. 115 (1974), are clearly distinguishable. In each case, subsequent developments did not moot the controversy because the challenged statute affected the *challenging party's* current or planned activities. There is no suggestion in the instant case that the Illinois Business Take-Over Act has such an effect on MITE. Nor do I believe that this case remains alive merely because it is the enjoined party who seeks appellate review. Otherwise, an enjoined party could always litigate the legal bases for the injunction even though the party who sought

The Secretary and MITE dispute the propriety of the injunction issued by the District Court in this case only with respect to a controversy that may ripen in another court. Because the controversy that is before the Court is no longer alive, I would vacate the judgment of the Court of Appeals and order that court to remand this case to the District Court with instructions to dismiss the complaint. See *Weinstein* v. *Bradford*, 423 U. S. 147, 149 (1975); *United States* v. *Munsingwear, Inc.*, 340 U. S. 36, 39 (1950).

---

the injunction no longer needs the injunction for the purposes for which it was obtained. Cf. *University of Texas* v. *Camenisch*, 451 U. S. 390 (1981).