**TELVEST, INC., Plaintiff,**

v.

**Junie L. BRADSHAW, et al.,
Defendants,**

and

**American Furniture Co., Inc.,
Intervenor-Defendant.**

No. 79–0722–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Sept. 27, 1982.

See also, 4th Cir., 618 F.2d 1029.

John F. Kay, Jr., Mays, Valentine, Davenport & Moore, Richmond, Va., for plaintiff.

Karen A. Gould, Joel H. Peck, James E. Farnham, Richmond, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

Telvest, Inc. ("Telvest"), a Delaware corporation with its principal place of business in Illinois, brings this action for declaratory and injunctive relief against Junie L. Bradshaw, Thomas P. Harwood, Jr., and Preston C. Shannon, all citizens of Virginia and Commissioners of the Virginia State Corporation Commission, and against Lewis W. Brothers, a citizen of Virginia and Director of the Division of Securities and Retail Franchising of the Virginia State Corporation Commission. These defendants shall be referred to collectively as the SCC. American Furniture Co., Inc. ("American"), a Virginia corporation with its principal place of business in Virginia, has intervened as defendant.

The plaintiff seeks a declaration that Va. Code § 13.1–529(b)(iii) is unconstitutional and seeks an injunction prohibiting the SCC from applying that subsection to it. That subsection applies the Virginia Take-Over Bid Disclosure Act, Va.Code §§ 13.1–528 to –541 ("the Act" or "the Virginia Act"), to certain unsolicited open market purchases of stock. Telvest asserts that part of the subsection violates the supremacy clause, U.S.Const. art. VI, cl. 2, the commerce clause, U.S.Const. art. I, § 8, cl. 3, and the due process and equal protection clauses of the 14th amendment to the U.S. Constitution.

This is a case of actual controversy for purposes of the Declaratory Judgment Act, 28 U.S.C. § 2201. This case is within the Court's federal question jurisdiction provided in 28 U.S.C. § 1331 and diversity juris-

diction provided in 28 U.S.C. § 1332.[1] Venue is proper in this district pursuant to 28 U.S.C. § 1391(a), (b).

On September 3, 1979, this Court issued a preliminary injunction against enforcement of an earlier version of Va.Code § 13.1–529(b)(iii), which had been enacted in 1979 ("the 1979 Proviso"). The United States Court of Appeals for the Fourth Circuit vacated the order granting that injunction, finding that the potential harm to the plaintiff resulting from enforcement of the 1979 Proviso did not outweigh the potential harm to the defendants resulting from the injunction, that it was not reasonably certain plaintiff would prevail on the merits, and that the public interest did not require the injunction. *See Telvest, Inc. v. Bradshaw*, 618 F.2d 1029 (4th Cir. 1980). The action then proceeded to trial in this Court, after which the parties submitted extensive post-trial briefs.

American manufactures and sells furniture for the home and for hotels and motels. As of mid-1981, it had total assets of over $46 million; for the previous three years, it had had sales of about $65–70 million per year, with earnings averaging over $2 million per year. American's common stock[2] is registered with the Securities and Exchange Commission (SEC) under § 12 of the Exchange Act, 15 U.S.C. § 78*l*, and is traded in the over-the-counter market. Daily price quotations for American stock are available through the National Association of Securities Dealers Automated Quotations System (NASDAQ) and are reported in the *Wall Street Journal.* As of mid-1981, American had nearly 2.8 million shares of stock outstanding, held by about 4,300 shareholders, some of whom lived within the Commonwealth of Virginia, and others who lived outside its boundaries.

On November 6, 1978, Telvest bought 15,000 shares of American stock. On December 28, 1978, Telvest's board of directors authorized its officers to buy up to 10% of American's outstanding shares. On May 23, 1979, Telvest filed a Schedule 13D with the SEC disclosing that Telvest owned 166,000 shares of American stock, approximately 5.9% of the outstanding shares. Telvest also stated that it intended to buy up to approximately 10% of the outstanding shares; to seek approval of the board of directors of its parent, Telco, to buy up to 20% of the outstanding shares; and to seek representation on American's board of directors. Telvest continued to buy shares and to file amendments to its Schedule 13D until on August 3, 1979, it filed an amendment disclosing that it owned 280,000 shares of American, about 9.9% of the outstanding stock.

By letter dated July 20, 1979, defendant Brothers advised Telvest that his office, the Division of Securities and Retail Franchising of the SCC, had become aware through news articles of Telvest's purchases of American stock. Brothers enclosed a copy of the Virginia Take-Over Bid Disclosure Act for Telvest's information. In a telephone conversation and a subsequent letter to Brothers, Telvest stated that it had previously been unaware of the 1979 Proviso applying the Act to open market purchasers. On February 15, 1980, Telvest filed an amendment to its Schedule 13D stating that Telvest no longer intended to increase its ownership in American to 20% or to seek representation on the board of directors, though Telvest did intend to increase its holdings in American. Telvest did in fact make subsequent purchases, so that at the time of trial, it held 328,000 shares of American, 11.64% of the outstanding stock.

1. In its findings issued from the bench on September 3, 1979, this Court found that the matter in controversy exceeds the value of $10,000, as required for diversity jurisdiction under 28 U.S.C. § 1332.

 Because the Court does not today reach questions under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* ("Exchange Act"), it does not assert jurisdiction under § 27 of that Act, 15 U.S.C. § 78aa, or under 28 U.S.C. § 1337, as plaintiff suggests. Similarly, because the Court does not today reach questions as to the alleged deprivation, under color of state law, of plaintiff's civil rights, the Court does not assert jurisdiction under 28 U.S.C. § 1343(3), (4), as plaintiff suggests.

2. All of the American stock at issue is common stock. For the sake of simplicity, the Court will hereinafter refer to it simply as stock or shares.

*The Act*

The Virginia Take-Over Bid Disclosure Act defines a "take-over" bid as any non-exempt offer to buy stock, such that the offeror's total holdings will exceed 10% of the outstanding shares of that class. Va. Code § 13.1–529(i). Such an offer is subject to certain requirements as to disclosure, price, and procedure.[3] In addition to making some offers automatically exempt from those requirements,[4] the Act gives the SCC discretion to find the following type of offer exempt:

> An offer which the Commission by order, after notice to the offeror and to the offeree company, shall exempt from the provisions of this chapter as not entered into for the purpose of, and not having the effect of, changing or influencing the control of the offeree company or otherwise as not comprehended within the purposes of this chapter.

Va.Code § 13.1–529(b)(vi).

Until 1979, the Act also exempted purchases in the open market, including the over-the-counter market, pursuant to Va. Code § 13.1–529(b)(iii). The 1979 Proviso to that subsection limited that exemption to situations where the offeror had acquired no more than 1% of the outstanding shares during the 6 months preceding the offer. 1979 Va. Acts ch. 200; *see Telvest, Inc. v. Bradshaw,* 618 F.2d at 1031 n.5. In 1980 the Virginia General Assembly again amended Va.Code § 13.1–529(b)(iii) to limit the open market purchase exemption in a different manner. Under the 1980 Proviso, if the offeror intends to change the control of the target company, it must make certain disclosures concerning such intentions to the SCC and to the target company; a Schedule 13D filing may satisfy this requirement. An offeror which owns more than 10% of the outstanding shares and which has bought more than 1% during the 12 months preceding the offer is presumed to intend to change the control of the target company unless the SCC determines otherwise pursuant to Va.Code § 13.1–529(b)(vi), the discretionary exemption provision. 1980 Va. Acts ch. 216.[5] This 1980

---

**3.** The requirements are essentially as follows: (1) An offeree may withdraw tendered shares within seven days after the offer. (2) In the event of an over-tender beyond the number the offeror wanted, the offeror must buy a pro rata amount from each offeree. (3) The offeror must pay each offeree the highest price paid to any offeree. (4) The offeror must make certain disclosures to the offeree at the time of the offer and to the SCC and the target company at least 20 days before the offer. (5) Either the target company or the SCC can request a hearing by the SCC to determine whether such disclosures were fair, full, and effective. *See* Va.Code §§ 13.1–530, –531. The Act uses the term "offeree company" rather than "target company." The Court will use the latter term to avoid confusion with "offeree," by which the Act refers to individual shareholders.

**4.** The Act automatically exempts, among others, the following types of offers:

(1) to purchase the issuer's own stock, *see* Va.Code § 13.1–529(b)(ii);

(2) to purchase stock not registered under § 12 of the Exchange Act, *see* Va.Code § 13.1–529(b)(iv);

(3) *one that the board of directors recommends and that requires two-thirds' shareholder approval after solicitation of proxies, see* Va.Code § 13.1–529(b)(v);

(4) to purchase stock from 10 shareholders or less during a 12-month period, *see* Va.Code § 13.1–529(b)(vii);

(5) to purchase an amount of shares such that the total of those shares and those bought during the preceding 12 months will not exceed 2% of the outstanding shares, *see* Va.Code § 13.1–529(b)(viii).

**5.** The current text of Va.Code § 13.1–529(b)(iii) defines the following type of offer as exempt:

> An offer to purchase shares to be effected by a registered broker-dealer on a stock exchange or in the over-the-counter market if the broker performs only the customary broker's function, and receives no more than the customary broker's commissions, and neither the principal nor the broker solicits or arranges for the solicitation of orders to sell shares of the offeree company; provided, however, that this exemption shall not apply to any such offer made by a person who intends to change the control of the offeree company unless such person shall have filed with the Commission and with the registered agent of the offeree company a statement setting forth the purpose of such change, the method of carrying out such intention and such other information as the Commission may require as necessary in the public interest or for the protection of investors; and

Proviso to the open market purchase exemption is the provision whose constitutionality the plaintiff challenges.

The SCC is, pursuant to Va.Code §§ 13.-1–532, –534, given administrative responsibility for the Act. The Act authorizes the SCC to issue injunctions and to impose penalties pursuant to Va.Code §§ 13.1–535, –537, respectively. Under Va.Code § 13.1–536, certain violations of the Act constitute misdemeanors punishable by a fine of $100 to $5,000, by confinement in jail of 30 days to 1 year, or both. The coverage of the Act is limited only by Va.Code § 13.1–529(e), which defines "offeree company" as "a corporation incorporated or a real estate investment trust created under the laws of Virginia and doing business in Virginia."

*Telvest's Challenge*

The purchases Telvest has made to increase its holdings to greater than 10% of the outstanding shares have been pursuant to automatic exemptions to the Act, as described in note 4 *supra*. The most notable of those exemptions is in Va.Code § 13.1–529(b)(viii), which allows a holder of more than 10% of the outstanding stock to purchase an additional amount up to 2% of the outstanding stock per year. This provision, of course, makes meaningless the part of the 1980 Proviso that would limit purchases by a holder of 10% or more to 1% per year. In any event, Telvest asserts that it now wishes to buy American stock on the open market at a rate greater than 2% per year and that it has the wherewithal to do so.

Telvest has never applied for a discretionary exemption under Va.Code § 13.1–529(b)(vi), as the 1980 Proviso allows it to do in order to rebut the presumption that it intends to change the control of American. While the SCC had considered nine other applications for such exemptions (and approved eight) up to the time of trial, each of

those applications had been *endorsed* by the target company. Thus, the parties have stipulated to what the SCC procedure would be for Telvest (or anyone else) seeking such an exemption where the target company *opposes* it. Telvest contends that those procedures would be protracted, expensive, and burdensome.

As heretofore noted, Telvest asserts that the 1980 Proviso runs afoul of the supremacy, commerce, due process, and equal protection clauses. The Supreme Court has recently provided definitive guidance as to the commerce clause issue in *Edgar v. MITE Corp.*, —— U.S. ——, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). Because the commerce clause claim is dispositive, the Court does not reach the plaintiff's assertions as to the other alleged bases of unconstitutionality; the Court expresses no opinion on them.

*The MITE Decision*

The *MITE* case proceeded in a manner very similar to that of the instant case. MITE Corporation ("MITE") initiated a cash tender offer for all outstanding shares of Chicago Rivet and Machine Co. ("Chicago Rivet"). MITE complied with the Williams Act, 15 U.S.C. § 78n(d), by filing a Schedule 14D–1, but did not comply with the Illinois Business Take-Over Act, Ill.Rev.Stat. ch. 121½, ¶ 137.51 *et seq.* (1979) ("Illinois Act"). Instead, MITE brought an action seeking a declaratory judgment that the Illinois Act was preempted by the Williams Act and violated the commerce clause and seeking injunctive relief. *See* —— U.S. at —— ——, 102 S.Ct. at 2633–34.

The Illinois Act required that every takeover offer (tender offer) for shares of a target company be registered with the Secretary of State. A target company was defined as one in which Illinois shareholders owned 10% of the class of shares sought, or

---

any person who, at the time he makes such offer, owns in excess of ten per centum of any class of the equity securities of the offeree company and has purchased more than one per centum of such class during the twelve-month period preceding such offer shall be presumed to have such intention unless the Commission determines otherwise

pursuant to § 13.1–529(b)(vi). A person required to file a Schedule 13D with the Securities and Exchange Commission pursuant to § 13(d) of the Securities Exchange Act of 1934 may file such Schedule 13D with the Commission if such Schedule 13D contains the information required in the preceding sentence.

for which two of the following three conditions were met: the company's principal executive office was in Illinois, the company was organized under Illinois law, or it had at least 10% of its stated capital and paid-in surplus in Illinois. The Act allowed the Secretary of State or the target company's outside directors or shareholders to call for a hearing in which the Secretary would adjudicate the fairness of disclosure or the substantive fairness of the offer. *See id.* at ——, 102 S.Ct. at 2633.

The District Court held the Illinois Act to be unconstitutional on both supremacy clause and commerce clause grounds, and it permanently enjoined enforcement of the Illinois Act against MITE's tender offer for Chicago Rivet. The Court of Appeals affirmed. *MITE Corp. v. Dixon,* 633 F.2d 486 (7th Cir. 1980). The Supreme Court affirmed on commerce clause grounds; three of the six Justices reaching the merits [6] would also affirm on supremacy clause grounds.

The commerce clause holding was set out in Part V, which was divided into sections A and B. Justice Powell joined only in V–B, which thus represents the substantive holding of the Court; four of the six Justices reaching the merits joined in Part V in total. Because the Supreme Court applied some of its findings in V–A to its analysis in V–B and because the opinion in V–A of four of the six Justices reaching the merits is certainly instructive, the Court will address both sections.

In the introductory paragraph of Part V, the Court noted that the commerce clause "permits only *incidental* regulation of interstate commerce by the states; direct regulation is prohibited." —— U.S. at ——, 102 S.Ct. at 2640 (emphasis in original) (citing *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970);

*Shafer v. Farmers Grain Co.,* 268 U.S. 189, 199, 45 S.Ct. 481, 485, 69 L.Ed. 909 (1925)). The Court discussed such "direct regulation" in V–A.

The Court contrasted "direct" regulation with that provided by state "blue sky" laws, which only regulate transactions occurring within the regulating states and which affect interstate commerce only incidentally. —— U.S. at ——, 102 S.Ct. at 2640 (citing *Hall v. Geiger-Jones Co.,* 242 U.S. 539, 557–58, 37 S.Ct. 217, 223, 61 L.Ed. 480 (1917)). The Court found the Illinois Act "directly regulates transactions which take place across state lines, even if entirely outside the State." —— U.S. at ——, 102 S.Ct. at 2641. The Court noted that the Illinois Act on its face would apply even if none of the target company shareholders were residents of Illinois. "Thus the Act could be applied to regulate a tender offer which would not affect a single Illinois shareholder." *Id.* The Court also stated that the commerce clause "precludes the application of a state statute to commerce that takes place wholly outside of the state's borders, whether or not the commerce has effects within the state." *Id.* (citing *Shaffer v. Heitner,* 433 U.S. 186, 197, 97 S.Ct. 2569, 2576, 53 L.Ed.2d 683 (1977); *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 775, 65 S.Ct. 1515, 1523, 89 L.Ed. 1915 (1945)). Because the Illinois Act imposed such a direct regulation on interstate commerce through its broad extraterritorial reach, the plurality found it constitutionally invalid.

In V–B, the Court found the Illinois Act to violate the commerce clause also under the test of *Pike v. Bruce Church, Inc.,* 397 U.S. at 142, 90 S.Ct. at 847, to be applied to state statutes that regulate interstate commerce *indirectly.* In such instances, "the burden imposed on [interstate] commerce must not be excessive in relation to the

---

**6.** After the District Court entered final judgment, MITE withdrew its tender offer. The majority of the Supreme Court held that the case was not moot, because a reversal of the District Court would expose MITE to civil and criminal liability under the Illinois Act. —— U.S. at —— - ——, 102 S.Ct. at 2633–34. Three Justices dissented, stating that the case

was moot. *See id.* at ——, 102 S.Ct. at 2648 (Marshall, J., dissenting); *id.* at ——, 102 S.Ct. at 2652 (Rehnquist, J., dissenting). Justice Powell stated that he agreed that the case was moot, but in view of the majority's decision to reach the merits, he joined Parts I and V–B. *Id.* at ——, 102 S.Ct. at 2642 (Powell, J., concurring in part).

local interests served by the statute." —— U.S. at ——, 102 S.Ct. at 2641. The Court found the "most obvious burden" the Illinois Act imposed on interstate commerce was its nationwide reach, as described in V–A. *Id.*

The local interests advanced to balance the burdens were: protecting resident security holders and regulating the internal affairs of companies incorporated under Illinois law. As to the first interest, the Court noted that "the state has no legitimate interest in protecting non-resident shareholders. Insofar as the Illinois law burdens out-of-state transactions, there is nothing to be weighed in the balance to sustain the law." *Id.* The Court also noted that the Illinois Act exempted a corporation's acquisitions of its own shares, which undermined the justification that resident shareholders needed protection in the context of tender offers generally. *Id.* Further, the Court expressed doubt that the Illinois Act provided any substantial benefit to Illinois shareholders, finding the protections it afforded "speculative." *Id.* As to the second interest advanced, the Court dismissed the internal affairs doctrine as being a conflict of laws principle of little use in this context. *Id.* Thus, the Court found that the burden on interstate commerce outweighed the putative local interests.

*Commerce Clause Analysis of the Virginia Act*

 The Court begins its analysis by noting that state statutes are presumed to be valid. *See, e.g., Telvest, Inc. v. Bradshaw,* 618 F.2d at 1033. Also, " 'statutes should be construed whenever possible so as to uphold their constitutionality.' " *Gra-*

ham v. Richardson, 403 U.S. 365, 382–83, 91 S.Ct. 1848, 1857–58, 29 L.Ed.2d 534 (1971) (quoting *United States v. Vuitch,* 402 U.S. 62, 70, 91 S.Ct. 1294, 1298, 28 L.Ed.2d 601 (1971)). However, the Court finds that much of what the Supreme Court said in *MITE* about the Illinois Act (which too, of course, enjoyed the presumption of constitutionality) could have been said as easily about the Virginia Act, as the 1980 Proviso applies it to open market transactions. Consequently, the Court concludes that the presumption of validity has been overcome in this case.

*Direct Burden*

Just as the Illinois Act did with regard to conventional tender offer transactions, the Virginia Act purports to apply to any open market purchase, whether or not the transaction takes place in Virginia and whether or not any Virginia resident is a party to the transaction. And the Virginia Act applies to companies with even less of a tie to Virginia than the target companies in Illinois had to have for Illinois Act coverage: a Virginia company need only be incorporated in and doing business in Virginia to be covered, whereas an Illinois company had to have its principal executive office in Illinois or have 10% of its stated capital and paid-in surplus represented in Illinois, as well as being incorporated there, to be covered. Of course, neither Act requires that the company have *any* in-state shareholders to be covered.[7]

American points to Telvest's own evidence to show that Telvest's actions led to an increase in the price of American stock

---

**7.** American notes that over 60% of its shares are held by Virginia residents. The Supreme Court noted that 27% of the Chicago Rivet shareholders lived in Illinois. Even if those figures established that the covered transactions were *more likely* to take place in-state and to involve state residents (open market transactions, like tender offer mailings, can take place anywhere), the statutes would still be vulnerable. Telvest, like MITE, *see* 633 F.2d at 488, has attacked the statute both facially and as applied. On its face, neither statute requires a tie between the covered transaction or parties and the state.

In the same vein, Telvest is not precluded from challenging this statute because of its failure to seek a discretionary exemption under Va.Code § 13.1–529(b)(vi), as the 1980 Proviso allows. MITE challenged the Illinois Act without attempting to comply with it. If it had filed a registration statement, it could possibly have become registered without going through the hearing that the Supreme Court found overly burdensome. *See* —— U.S. at ——, 102 S.Ct. at 2635.

and so had an effect on American's shareholders (presumably including those who happen to live within Virginia). But as the Supreme Court pointed out, in language quoted *supra,* a state cannot regulate commerce wholly outside its borders, "whether or not the commerce has effects within the state." —— U.S. at ——, 102 S.Ct. at 2641.

Of the five Justices who did not join in Part V–A of the *MITE* decision, none directly rejected or otherwise addressed it. Accordingly, this Court is strongly guided by the analysis of direct burdens on commerce contained in that Part. Because the Virginia Act "purports to regulate directly and to interdict interstate commerce, including commerce wholly outside the state, it must be held invalid." *Id.* at —— ——, 102 S.Ct. at 2641.

*Burdens vs. Benefits*

The *MITE* Court cited the extraterritorial reach of the Illinois Act as its "most obvious burden" on interstate commerce. *Id.* As heretofore noted, the Virginia Act, through the 1980 Proviso, has at least as great a reach, since it purports to cover open market purchases, wherever made, even if the transaction crosses state lines or takes place entirely outside Virginia, and even if neither party to the transaction has any ties to Virginia other than owning stock in a company that is incorporated in Virginia and does business in Virginia.

The Supreme Court also discussed in *MITE* the economic effects of allowing the Illinois Secretary of State to block a nationwide tender offer. The defendants assert that the Virginia Act does not have the same effect since it only obstructs certain open market purchases. This assertion is somewhat at odds with defendants' insistence that Telvest's open market purchases *do* constitute a tender offer—a "creeping

tender offer"—and that the benefit of the 1980 Proviso is in preventing such tender offers. But even taking the defendants' assertion at face value, the plaintiff need not establish that the Virginia Act imposes the *same* burdens, but only that it imposes *excessive* burdens in comparison to the benefits.

Even supposing that plaintiff needs to establish an additional burden beyond the "most obvious" one imposed by the Act's extraterritorial reach, the Court finds the plaintiff has done so. When a major buyer of a given security is removed from the market, shareholders—including those who are Virginia residents—are deprived of the opportunity to sell their shares to a willing buyer.[8] While the recent dramatic and essentially unexplained fluctuations in the stock market bolster the Court's conviction that few, if any, really know how the stock market works, the Court must give some credence to the testimony of plaintiff's expert and conclude that Telvest's large purchases of American stock were at least *a* cause for its rise in price, as Telvest's departure from the market was surely *a* cause for the subsequent drop in price.[9] Since the Act exempts securities that are not registered under § 12 of the Exchange Act, *see* Va.Code § 13.1–529(b)(iv), the Act effectively operates to disrupt prices of securities almost *exclusively* in interstate commerce—here, the nationwide over-the-counter market quoted through NASDAQ. Such disruption constitutes a substantial burden on interstate commerce.

At a minimum, the Act removes a major purchaser from the market and disrupts prices during the time the SCC considers an application for a discretionary exemption, even if the SCC eventually grants the exemption, unless the purchaser applies well in advance of reaching the 10% level and

---

**8.** The Court addresses *infra* the defendants' contention that the shareholders would be deprived of a potential control premium if they made the sales described in text. The Court here merely attempts to track the *MITE* analysis, *see* —— U.S. at ——, 102 S.Ct. at 2641–42, and describe the disruptive effect on interstate commerce. The asserted benefit of such disruption is a separate question.

**9.** Telvest bought its first shares at $3.375 per share. By the time Telvest reached the area of 10% ownership, the price per share had gone to $7.50. Shortly after Telvest curtailed its purchases, the price per share fell to around $5.50.

the SCC acts on the application promptly. The plaintiff has satisfied the Court that it is more likely than not the case that when a target company contests an application, the procedure for deciding on the application, including the available automatic right of appeal to the Virginia Supreme Court, *see* Va.Code § 12.1–39, would indeed be time-consuming. During that time, not only would the market be disrupted, but conditions could easily change so significantly that the purchaser would no longer be interested in pursuing its planned purchases. Again, shareholders would be deprived of the opportunity to sell to a willing buyer.

Balanced against these burdens, the defendants assert Virginia's legitimate interest in protecting the interests of its shareholders. Telvest does not dispute the legitimacy of this interest. But "[w]hile protecting local investors is plainly a legitimate state objective, the state has no legitimate interest in protecting non-resident shareholders." *MITE,* —— U.S. at ——, 102 S.Ct. at 2642. Also, the Virginia Act, like the Illinois Act, completely exempts a corporation's acquisitions of its own shares. *See* Va.Code § 13.1–529(b)(ii). Virginia, like Illinois, seems concerned with giving shareholders only selective protection, if protection be the purpose.

The point at which this Court has the greatest difficulty in applying the *MITE* analysis is in evaluating the degree to which the Virginia Act "enhances the shareholders' position." *See* —— U.S. at ——, 102 S.Ct. at 2642. The protection the defendants attribute to the Act is against "creeping tender offers." A creeping tender offer is

> an acquisition strategy where, by achieving a substantial position in a company through open market purchases, an acquiring company can achieve a blocking position which enables them to purchase the remaining shares by tender or exchange offer at a cost that would be substantially less than if a formal tender offer had been made earlier.

Post-Trial Brief of State Defendants, at 15. The defendants assert that the danger in the creeping tender offer is that the share-holders who sell on the open market are thus robbed of their share of the control premium. And the defendants assert that Telvest demonstrated the danger in the technique by its actions in acquiring Hickory Furniture Co. of North Carolina.

The Court not only does not claim to any expertise in economics, but affirmatively acknowledges its lack thereof. Its layman's interpretation of the testimony of plaintiff's economic expert is as follows: in the type of transaction the defendants have described, the total *amount* of control premium paid is essentially the same as it would have been in a conventional tender offer, though differently *apportioned.* The sellers on the open market take their share of the control premium in the form of the higher price for their shares that results from the acquiring company's purchases. Those shareholders who wait for the eventual formal tender or exchange offer get a higher control premium than if the whole acquisition had proceeded as a formal tender offer, since those remaining shareholders now hold a commodity that is scarcer than it was at the beginning of the acquisition. But assuming the Court's restatement of the plaintiff's contention is essentially correct, the plaintiff did not submit enough empirical evidence to convince the Court that its characterization is necessarily accurate.

Which of these scenarios—the one just described or the one that would result from the Virginia Act—provides, on balance, a greater benefit to shareholders in general seems to be purely conjectural; none of the evidence before the Court enlightened the Court as to that question. In the ordinary course of reviewing legislation, the Court, of course, defers to the judgment of the legislature on such questions. Absent the extraterritorial reach of the Virginia Act, the Court would so defer here. But since the Virginia Act is not fashioned to focus on the welfare of Virginia shareholders, the Court finds the benefit to Virginia shareholders to be far too "speculative," *see* ——

U.S. —— at ——, 102 S.Ct. at 2642, to outweigh the substantial burdens on interstate commerce. Indeed, it may be that in practice, the shareholders who sell their shares on the open market are much more likely to be from outside Virginia, so that local citizens, who have their special parochial reasons to want to hold onto their investment in a local enterprise, generally reap a greater control premium in a creeping tender offer than they would in a conventional tender offer.[10]

The Court concludes that the Virginia Act "imposes a substantial burden on interstate commerce which outweighs its putative local benefits. It is accordingly invalid under the commerce clause." *MITE*, —— U.S. at ——, 102 S.Ct. at 2643.

An appropriate order will issue.

### ORDER

For the reasons stated in the memorandum of the Court this day filed, and deeming it just and proper so to do, it is ADJUDGED and ORDERED as follows:

1. That the amendment to Va.Code § 13.1–529(b)(iii) effective March 19, 1980 is declared to be null and void as violative of the commerce clause, U.S.Const. art. I, § 8, cl. 3.

2. That defendants, Junie L. Bradshaw, Thomas P. Harwood, and Preston C. Shannon, Commissioners of the Virginia State Corporation Commission, and Lewis W. Brothers, Jr., Director of the Division of Securities and Retail Franchising of the Virginia State Corporation Commission, their successors in office, their agents, servants, employees, and attorneys, and all persons in active concert or participation with them, are permanently enjoined from taking any action whatsoever to enforce or apply the Virginia Take-Over Bid Disclosure Act, Va.Code §§ 13.1–528 to –541, or any other provision of state law incorporated by reference therein, or any other order, rules or regulations issued pursuant thereto, against Telvest, Inc. ("Telvest") or those acting on its behalf in connection with Telvest's open market purchases of the shares of common stock of American Furniture Company, Incorporated made under the exemption provided by § 13.1–529(b)(iii) of the Code of Virginia as it existed prior to its amendment effective July 1, 1979 and its amendment effective March 19, 1980.

3. That execution of this order is hereby stayed for ten (10) days to permit defendants, or any of them, to seek a further stay of this order from the United States Court of Appeals for the Fourth Circuit.

Let the Clerk send a copy of this order and the accompanying memorandum to all counsel of record.

---

**10.** Economic and empirical questions aside, the Court has problems conceptually with the notion that at the time the open market purchases are made there exists an available control premium for the shareholder to sell or to be robbed of. On the logic encompassed in the concept of the creeping tender offer, there is no reason to stop regulating at 10%; the logic suggests that the very first open market share bought by an eventual acquirer should involve part of the control premium. Such a notion is surely at odds with the expectations of most shareholders who transact faceless exchanges in the national markets. Trading shares on the open market is simply qualitatively different from tendering them to a takeover bidder.

At any rate, as the Court has suggested previously, the defendants' real complaint is with the definition of a tender offer. They have tried to get a firm definition of a tender offer from the SEC and have been left wanting. But if the defendants insist on treating these open market purchases as part of a tender offer, they run squarely into the preemption problem that the Court today finds unnecessary to address. The Court suggests that the defendants' remedy lies with the SEC and its treatment of tender offers.