TELVEST, INC., a Delaware Corporation, Appellee,

v.

Junie L. BRADSHAW, Thomas P. Harwood, Preston C. Shannon, Commissioners of the Virginia State Corporation Commission; Lewis W. Brothers, Jr., Director, Division of Securities and Retail Franchising; American Furniture Company, Appellants.

No. 82–1882.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 10, 1982.

Decided Jan. 6, 1983.

James E. Farnham, Richmond, Va. (Robert P. Buford, K. Dennis Sisk, Hunton &

Williams, Joel H. Peck, Donald G. Owens, Associate Gen. Counsel, State Corp. Com'n, Richmond, Va., on brief), for appellants.

F. Claiborne Johnston, Jr., Richmond, Va. (Anthony F. Troy, M. Scott Hart, Mays, Valentine, Davenport & Moore, Richmond, Va., Nathan H. Dardick, Dardick & Hadwin, Chicago, Ill., on brief), for appellee.

Before WINTER, Chief Judge, CHAPMAN, Circuit Judge, and BUTZNER, Senior Circuit Judge.

HARRISON L. WINTER, Chief Judge:

American Furniture Company, Incorporated (American), the apparent target of a so-called "creeping tender offer"[1] which was initiated by open market purchases, and Junie L. Bradshaw, et al., the officials who enforce Virginia's Take-Over-Bid Disclosure Act, appeal from a declaratory decree adjudging Virginia's Take-Over Bid Disclosure Act, Va.Code § 13.1–529(b)(iii), unconstitutional and permanently enjoining its enforcement. The suit for declaratory and injunctive relief was instituted by Telvest, Inc. (Telvest) which owns greater than 10 percent of American's stock and which represents that it wishes to purchase additional shares on the open market at a rate in excess of 2 percent per annum.

We affirm, but on a more limited basis than that assigned by the district court. 547 F.Supp. 791.

I.

In a prior appeal, *Telvest, Inc. v. Bradshaw*, 618 F.2d 1029 (4 Cir.1980), we held that the balance of equities did not warrant the district court's grant of a preliminary injunction enjoining enforcement of the statute. We decided that case only on the record made to support a preliminary in-

junction, and we outlined Virginia's statutory scheme for regulating take-over bids. We will not repeat the scheme in detail in this case, which, of course, is before us on a complete record after full trial and the fashioning of permanent relief.

Briefly stated, Virginia has had a Take-Over-Bid Disclosure Act, Va.Code §§ 13.1–528 to 13.1–541, since 1968. Prior to 1979 it contained an exemption for open market purchases, but in 1979 it was amended in an effort to regulate "creeping tender offers". The 1979 statute removed the exemption for all offerors who acquired more than 1 percent of a Virginia company's stock within the preceding six months. Then effective March 19, 1980, the Act was further amended with the net result that:

(i) No offer to purchase stock on the open market or otherwise may be made by an offeror who intends to change the control of a Virginia corporation unless the offeror files a statement with the State Corporation Commission and the target company "setting forth the purpose of such change, the method of carrying out such intention and such other information as the Commission may require as necessary in the public interest or for the protection of investors ..." § 13.1–529(b)(iii). An offeror who is required to file a Schedule 13D with the Securities and Exchange Commission pursuant to § 13(d) of the Securities Exchange Act of 1934 may file that statement in lieu of the statement required by the Virginia statute *if the Schedule 13D contains the information required by Virginia law. Id.*

(ii) Any offeror who owns more than ten percent of the stock of a Virginia company and who has purchased more than one percent of that stock during the preced-

---

[1]. The term "creeping tender offer" has little recognition in the decided cases or in legal literature. American and the defendant Virginia enforcement officials define it as an acquisition strategy where, by achieving a substantial position in a company by open market purchases, a purchaser can achieve a blocking position which enables it to purchase the remaining shares by tender or exchange offer at a cost substantially less than that which would be

required if a formal tender offer were made in the first instance. In short it is an acquisition device which avoids or minimizes the control premium which a would-be acquirer is usually required to pay in a conventional tender offer. *See generally* Note "Developments in Corporate Takeover Techniques: Creeping Tender Offers, Lockup Arrangements, and Standstill Agreements", 39 Wash. & Lee L.Rev. 1095 (1982).

ing 12 month period is presumed to intend to change control of the Virginia company, § 13.1–529(b)(iii). The presumption can be rebutted only by an order of the Commission, after notice to the offeror and to the Virginia company, upon the Commission's determination that the purchase does not have the purpose or effect of changing or influencing control of the target company. § 13.1–529(b)(vi).

Thus, since March 19, 1980, an offeror who desires to change control of a Virginia company through open market purchases must file a statement of his intent, the purpose of the change, how it is to be carried out and other necessary information, and thus obtain an exemption from the Commission. But an offeror who owns more than 10 percent of the stock of a Virginia company cannot obtain an exemption by merely filing a statement of his intent even though his intent is not to effect or influence control. He is presumed to intend to change control, and if that is not the fact, he must prove his benign purpose in what may become a full adversary hearing before the Commission with the possibility of judicial review.

To date, there has been only one contested proceeding in which an application for exemption was granted. It was granted in less than two weeks. Still there can be little doubt that, as the district court found, should Telvest seek an exemption from the Act by proving that its contemplated purchases do not have the purpose or effect of changing or influencing control of American, the procedure may be a lengthy one. If American, or the Commission's staff, were to dispute the purpose, there would be an adversary proceeding before the Commission. Unlike other Commission proceedings, cf. § 13.1–531, there is no statutory direction as to when a hearing must be begun or when the Commission must rule. The rules of the Commission applicable to the proceeding would permit discovery and the production of documents. The hearing before the Commission may be a full one with introduction of evidence by each of the parties, cross-examination of witnesses and introduction of documentary evidence. Post-hearing briefs might be entertained. The decision of the Commission could be appealed to the Virginia Supreme Court, and the appeal could require seven months to complete.

Telvest began to purchase American's stock in 1978 with an initial purchase of 15,000 shares. By May 23, 1979 it had acquired an aggregate of 166,000 shares— approximately 5.9 percent of the outstanding stock—and it filed a Schedule 13D with the SEC disclosing that fact and announcing its intention (a) to purchase up to 10 percent of American's outstanding stock, (b) to seek the approval of its parent company to purchase up to 20 percent of American's outstanding stock, and (c) to obtain representation on American's board of directors. By August 3, 1979 it had acquired 280,000 shares of American's stock—about 9.9 percent.

Shortly before August 3, the Virginia Commission advised Telvest of the existence and purported coverage of the Virginia Act and Telvest thereafter amended its Schedule 13D filing to disavow its intention to increase its ownership in American to 20 percent and to seek representation on its board of directors. It did not, however, abandon its intention to purchase more stock and by the time of trial it held 328,000 of American's shares—11.64 percent of the outstanding stock. Although all of Telvest's purchases to date have been made pursuant to one or more exemptions in the Virginia Act which were then available to it, it is prohibited under penalty of civil and criminal sanctions from future acquisition of more than 2 percent of American's stock in any twelve-month period unless Telvest concedes that it is seeking control of American or unless it successfully rebuts the presumption that it seeks to change or influence the change of control of American.

II.

The parties have stipulated that as of June 27, 1981, American had 2,779,479 shares of stock outstanding owned by ap-

proximately 4,300 shareholders, approximately 60 percent of whom live within Virginia and approximately 40 percent of whom are nonresidents. Since the Virginia Act, while limited to Virginia companies, is not limited to stock transactions between Virginia purchasers and Virginia sellers or to transactions in Virginia, it has extraterritorial effect and it has an effect—at least indirect—on interstate commerce. As the district court recognized, the principles announced in *Edgar v. MITE Corp.,* —— U.S. ——, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), with respect to impermissible indirect burden on interstate commerce control the decision here.

*MITE* was a case which concerned the validity of the Illinois Business Take-Over Act. That statute regulated tender offers by requiring disclosures, waiting periods, withdrawal, proration and equal consideration rights. It also permitted a hearing in which the Illinois Secretary of State could adjudicate the accuracy of the disclosures or the fairness of the offer itself. The Act applied to all corporations having an Illinois nexus, i.e., where Illinois shareholders owned 10 percent of the stock, or where two of the following conditions were met: (i) the corporation's principal office was in Illinois, (ii) the corporation was organized under Illinois law, or (iii) at least 10 percent of the corporation's stated capital and paid-in surplus were in Illinois.

While not all parts of the opinion of the Court holding the statute invalid gained the concurrence of a majority of the members of the court, there was a majority for the holding that the statute imposed an impermissible indirect burden on interstate commerce. Relying upon *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970), the Court stated that in order for a state statute indirectly regulating interstate commerce to be valid "the burden imposed on that commerce must not be excessive in relation to the local interests

served by the statute." —— U.S. at ——, 102 S.Ct. at 2641. When that test was applied, the Court identified as the most obvious burden on interstate commerce the assertion by Illinois of the power to determine whether a tender offer may proceed everywhere. The Court concluded that this burden was not outweighed by the two asserted justifications: Illinois' interest in protecting local investors, and Illinois' interest in regulating the internal affairs of an Illinois corporation. With regard to the former, the Court's reasoning was that, first, Illinois could claim no benefit from whatever protection its statute afforded nonresident shareholders, second, Illinois' asserted interest in protecting shareholders was undermined by the Act's exemption of a corporation's acquisition of its own shares, third, the Illinois statute largely duplicated the disclosure provisions of federal law (the Williams Act), and fourth, to the extent that the Illinois Act required disclosures beyond those required by federal law, the risk that they would generate defensive tactics by incumbent management and thus defeat the tender offer might outweigh any possible benefit to the shareholders. With regard to Illinois' interest in regulating the internal affairs of an Illinois corporation, the Court noted that a tender offer was for a transfer of stock by a stockholder to a third person, a transaction not involving the internal affairs of the issuing corporation, and the Illinois Act applied as well to certain non-Illinois corporations as to which Illinois could have no such interest.

We therefore take our lead from *MITE* and turn to a consideration of the burden of the Virginia statute on interstate commerce weighing against it the local interests that it purports to serve.[2]

### III.

As we have said, the Virginia statute, unlike the Illinois statute considered in

---

**2.** In the instant case, the district court ruled that the 1980 amendment to the Virginia Act was invalid because the burden it imposed on interstate commerce was not outweighed by the benefit or protection that it afforded local

interests. It also held that the 1980 amendment was invalid as a direct regulation of interstate commerce. Because we agree with the first holding, we do not reach or express any views on the correctness of the second.

*MITE,* is limited to Virginia companies. It is, however, not limited to transactions between residents of Virginia, and in the instant case approximately 40 percent of the potential sellers of American's stock are nonresidents of Virginia. Indeed, Telvest, the prospective purchaser, is not a Virginia corporation, has its principal office in Illinois and is not qualified to do business in Virginia. The burden on interstate commerce in the case of a purchaser, owning in excess of 10 percent of the stock of a Virginia company and having purchased more than 2 percent in the twelve months preceding an offer, to demonstrate that he does not seek to change the control or influence the control of that company is a substantial one. The effectiveness of the offer to purchase may be postponed for a considerable period of time—sufficient at least to permit a dramatic change in market conditions—with an uncertain result as to whether the offer may go forward or whether it will be nullified.

Even aside from the dislocation just described, there was in this case expert testimony that when Telvest, under Virginia law, had an unrestricted right to purchase American's stock, the effect of its purchases was to raise the market value from $4.00 to $7.50 per share. But when as a result of the 1979 and 1980 legislative enactments, Telvest substantially reduced its purchases, there was a drop in value of $2.00 per share for each of the 2.8 million outstanding shares. Thus, the Virginia law denied both resident and nonresident shareholders an opportunity to sell their American stock at a premium.

The expert also identified as deleterious economic effects of Virginia's efforts to regulate open market purchases (1) investment in Virginia companies would be discouraged by the increased cost and uncertainties of investing, (2) impairment of the ability of a free market efficiently to price

securities and allocate resources, and (3) a reduction in the incentive to incumbent management to perform well and thus support a high market price for the securities of the enterprise.

The sole local interest that the Virginia statute purports to serve is the protection of Virginia stockholders. As set forth in the joint brief of American and the Virginia officials charged with enforcement of the Virginia statute:

The 1980 Proviso deals with open market purchases of stock in excess of 10%. The Proviso does not speak to the conventional tender offer mechanism. The practical impact of the Proviso is to enhance substantially the ability of a shareholder to make an informed investment decision. The 1980 Proviso accomplishes this objective by compelling the open market purchaser, upon reaching the 10% level, to disclose clearly and unambiguously his intentions with respect to changes in control of the offeree company. In short, the 1980 Proviso provides a shareholder with the only practical and effective means for dealing intelligently with actual or potential creeping tender offers. The Williams Act, as a practical matter, does not afford the shareholder adequate protection against the perils of the creeping tender offer.[3]

We do not think, however, that this benefit is substantial. First, it is incorrect to say that the Williams Act amendments to the Securities Exchange Act of 1934 provide no means for a shareholder to determine if control of a corporation of which he is a shareholder is being sought by open market purchases. The Williams Act— since 1968—has required disclosure of any purpose to change control, if there be such a purpose, and the means by which such intention is to be effected. This disclosure is required to be made when a purchaser acquires more than 5 percent of an equity

---

**3.** Elsewhere in their brief, the defendants identify the "informed investment decision" as a decision by a seller to hold out for the control premium or the market rise which may be expected to result from active purchasing if the seller knows that a purchaser is seeking control. It is also suggested that if an existing stockholder is pleased by the identity of the acquirer seeking control and thinks that that acquirer would provide more successful management, the existing stockholder might seek to increase his investment.

security, as distinguished from the Virginia threshold requirement of more than *10* percent. *See* 15 U.S.C. §§ 78m(d)–(e), 78n(d)–(f); *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.,* 476 F.2d 687, 696–7 (2 Cir.1973); *Chromalloy American Corp. v. Sun Chemical Corp.,* 611 F.2d 240 (8 Cir.1979); *Dan River, Inc. v. Unitex Ltd.,* 624 F.2d 1216, 1226 n. 9 (4 Cir.1980).

We think that the Williams Act provides all of the protection to an investor that the Virginia Act is claimed to afford. As we said in *Dan River,* quoting from *Gulf & Western Industries, supra,* under the federal securities laws any "perceptible desire to influence substantially the issuer's operations" regardless of a "fixed plan" to acquire control must be disclosed. *Dan River,* 624 F.2d at 1226 n. 9. If disclosures are inadequate and provide insufficient indication of intent to control, *Dan River* recognizes a remedy in a federal court. Moreover, federal law requires a "prompt" disclosure of any material changes in facts disclosed in a federal disclosure so that if an investor subsequently decides to seek control, he must disclose that fact. *See* 17 C.F.R. § 240.13d–2.[4] *Cf. General Aircraft Corp. v. Lampert,* 556 F.2d 90 (1 Cir.1977).

Second, as in *MITE,* Virginia has no legitimate interest in protecting nonresident stockholders, so that the burden imposed on them by denying them an opportunity to sell American stock at a premium cannot be offset by any asserted benefit from further disclosure. There is further dilution in the fact that the Virginia statute exempts purchases by an issuer of its own stock. § 13.1–529(b)(ii). As in *MITE* and to paraphrase the Court's opinion, this exemption is "at variance with [Virginia's] justification for the burdens the statute imposes on interstate commerce." —— U.S. at ——, 102 S.Ct. at 2642.

It is claimed that the Virginia Act benefits shareholders by requiring "unambiguous" disclosure of intent. However, when an offeror's plans are indefinite, as they often will be, an unambiguous disclosure of intent to seek control or not to seek control may subsequently mislead rather than inform. *Cf. Chromalloy,* 611 F.2d at 247.

The most significant difference between the Williams Act and the Virginia statute is that the former requires an acquirer to disclose his purpose to acquire control while the latter, in the case of an acquirer who owns more than 10 percent of the stock of a target and who has purchased more than 1 percent in the last year, is presumed to have the purpose of acquiring or influencing control. The difference is one of the burdens of persuasion. Under the Williams Act, the burden of disclosure is upon the acquirer, and if the truthfulness of its disclosure is questioned, the burden is upon the one seeking to prove its untruthfulness. Under the Virginia Act, the burden is upon the acquirer to disprove the statutory presumption.

We cannot say that the difference saves the validity of the Virginia Act. The difference would be significant if it is assumed that an acquirer would fail to comply, or was likely to fail to comply, with the disclosure provisions of the Williams Act. But there is nothing in this record to warrant making either assumption. If the assumption is unwarranted then we think that the requirements of the Williams Act—that an accurate, informative and full disclosure be made and that the disclosure be amended promptly to reveal any change in the plans originally disclosed—provide as much protection to a Virginia shareholder in a Virginia company as that afforded him by the Virginia Act.

---

**4.** With regard to an acquirer who is willing to concede his purpose to acquire control, there is legislative recognition that in many cases the disclosure required by federal law (Schedule 13D) will suffice as disclosure under the Virginia Act. Section 13.1–529(b)(iii), in requiring the filing of a statement with the Virginia Commission setting forth the purpose of a change of control and the method of carrying it out, states that: "A person required to file a Schedule 13D with the Securities and Exchange Commission pursuant to § 13(d) of the Securities Exchange Act of 1934 may file such Schedule 13D with the [Virginia] Commission if such Schedule 13D contains the information required ...."

**582**

In sum, we think that the burden on interstate commerce created by the 1980 amendment to Virginia's Take-Over-Bid Disclosure Act is a lesser one than the Illinois statute held invalid in *MITE*. But we think that the protections purportedly afforded Virginia shareholders of Virginia corporations are too speculative to sustain the Virginia statute's validity as it applies in this case.

AFFIRMED.