ESMARK, INC., Movant,

v.

James C. STRODE, as Director of the Division of Securities, Department of Banking and Securities, Commonwealth of Kentucky and Reliance Universal, Inc., Respondents.

and

James C. STRODE, as Director of the Division of Securities, Department of Banking and Securities, Commonwealth of Kentucky, Movant,

v.

ESMARK, INC. and Reliance Universal, Inc., Respondents.

Supreme Court of Kentucky.

Oct. 12, 1982.

Bert T. Combs, Richard W. Iler, Wyatt, Tarrant & Combs, Louisville, Robert B. Mazur, Louis J. Barash, Wachtell, Lipton, Rosen & Katz, New York City, for Esmark, Inc.

Roger B. Sledd, Benjamin J. Isaacs, Division of Securities, Dept. of Banking & Securities, Frankfort, for James C. Strode.

Charles A. Robertson, James S. Welch, Wesley P. Adams, Jr., Ogden, Robertson & Marshall, Louisville, for Reliance Universal, Inc.

STEPHENSON, Justice.

The trial court held that Esmark, Inc., by its acquisition of Reliance Universal, Inc., stock violated Kentucky's Take-Over Act, KRS 292.560, et seq., and ordered Esmark to divest itself of the stock acquired in violation of the statute. The Court of Appeals affirmed that portion of the judgment adjudging a violation of the Take-Over Act, but reversed so much of the judgment that ordered Esmark to divest itself of the stock. We granted discretionary review and reverse that part of the Court of Appeals' decision affirming the holding that Esmark is in violation of the Kentucky Take-Over Act. We affirm that part of the Court of Appeals' decision which holds Esmark is not required by the Act to divest itself of Reliance stock.

Esmark, Inc., a Delaware corporation with its principal place of business in Chicago, Illinois, is a holding company with various nationally known subsidiaries.

James C. Strode is the director of securities of the Department of Banking and Securities for the Commonwealth of Kentucky.

Strode filed suit against Esmark charging a violation of the Kentucky Take-Over Bids Disclosure Act, KRS 292.560 et seq. Esmark had been purchasing shares of stock of Reliance Universal, Inc., a Kentucky corporation, with its principal place of business in Louisville, Kentucky. Approximately one-half of Reliance shareholders are residents of Kentucky, and these shareholders own approximately one-half the outstanding shares of Reliance stock. The manufacturing facilities of Reliance are in Kentucky and other states, and Reliance stock is traded on the over-the-counter market in New York City.[1]

Esmark engaged a securities broker to solicit and purchase Reliance stock. As a result of the purchases of Reliance stock, Esmark soon owned approximately 7% of the outstanding shares of Reliance stock. Then in compliance with the Williams Act amendments to the Securities and Exchange Act of 1934, Esmark filed a Schedule 13D (14D is required to be filed after a tender offer is made) with the Securities and Exchange Commission reporting the transaction and stating in the purpose of the transaction that Esmark "has acquired the Reliance stock owned by it to further its effort in seeking to acquire Reliance" and that Esmark may from time to time make further purchases of Reliance stock, depending upon market prices and other factors.

*The Wall Street Journal* reported the material in Schedule 13D including a statement that Kentucky law appeared to prohibit a tender offer.

Two further amendments to the Schedule 13D were filed showing further accumulation of Reliance stock amounting to over 11% of outstanding shares. The "purpose of transaction" remained the same.

Strode filed suit against Esmark alleging violation of the Kentucky Take-Over Statute. The trial court enjoined Esmark from making further purchases of Reliance stock,

---

**1.** Over the counter shares are "bid and asked" prices through direct solicitations of purchases and sales between brokers.

from making a take-over bid, and ordered Esmark to divest itself of all shares of Reliance in excess of 5%. After the decision by the Court of Appeals affirming the injunctions and reversing the order of divestiture, Esmark and Strode sought discretionary review which has been granted.

Strode argues that divestiture of stock in accordance with the order of the trial court is authorized by the statute and that the Court of Appeals erred in that respect. Further Strode argues that Esmark should disgorge the profits on the stock. This issue will be addressed later in this opinion.

Esmark argues lack of *in personam jurisdiction,* that open market purchases are not a tender offer within the meaning of the Kentucky Act, and that the Kentucky Act as applied violates the Commerce Clause, Article I, Section 8 of the Constitution of the United States.

■ We are of the opinion the last argument of Esmark is dispositive and that KRS 292.560 violates the Commerce Clause of the United States Constitution.

We reach this conclusion after a careful study of *Edgar v. Mite Corp.* et al., —— U.S. ——, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982)[2] which involved an Illinois take-over statute.

The pertinent provisions of KRS 292.560 are as follows:

"(1) 'Take-over bid' means the acquisition of or offer to acquire, pursuant to a tender offer or request or invitation for tenders made to or accepted by ten (10) or more record holders, any equity security of a corporation organized under the laws of this state or having its principal place of business and substantial assets within this state, if after acquisition thereof the offeror would directly or indirectly, be a record or beneficial owner of more than five per cent (5%) of any class of the issued and outstanding equity securities of such corporation. 'Take-over bid' does not include:

(a) Bids made by a dealer for his own account in the ordinary course of his business of buying and selling such security;

(b) An offer to acquire such equity security solely in exchange for other securities of the same company, or the acquisition of such equity security pursuant to such offer, for the sole account of the offeror, in good faith and not for the purpose of avoiding KRS 292.570 to 292.-630, and not involving any public offering of such other securities within the meaning of the Federal Securities Act of 1933, ch. 38, title I, sec. 4, 48 Stat. 77, as amended;

(c) Any tender offer or request or invitation for tenders to which the target company consents, by action of its board of directors, if such board of directors has recommended acceptance thereof to shareholders and the terms thereof, including any inducements to officers or directors which are not made available to all shareholders, have been furnished to shareholders."

The pertinent provisions of KRS 292.570 are as follows:

"(1) No offeror shall make a take-over bid unless at least twenty (20) days prior thereto he announces publicly the terms of the proposed take-over bid and files with the director of securities and the target company copies of all information required by subsection (3) of this section, and either:

(a) Within ten (10) days following such filing no hearing is ordered by the director or requested by the target company;

(b) A hearing is requested by the target company within such time but the director finds that no cause for hearing exists;

(c) A hearing is ordered within such time and upon such hearing the director adjudicates that the offeror proposes to make fair, full and effective disclosure to offerees of all information material to a decision to accept or reject the offer.

**2.** The judgment of the trial court was entered and the Court of Appeals' decision rendered prior to the date of *Edgar v. Mite.* Thus we do not sort through the myriad cases on "creeping tender offers."

(2) No offeror shall make a take-over bid if he owns five per cent (5%) or more of the issued and outstanding equity securities of any class of the target company, and of which were purchased within one (1) year before the proposed take-over bid, and the offeror, before making any such purchases, or before the thirtieth day following July 1, 1976, whichever is later, failed to publicly announce his intention to gain control of the target company, or otherwise failed to make fair, full, and effective disclosure of such intention to the persons from whom he acquired such securities."

Also KRS 292.570(3) provides for essentially the same information as required by the Williams Act for Schedule 14D or Schedule 13D.

With the factual background here and the pertinent portions of the Kentucky statute, we examine the Illinois act and the disposition in *Mite, supra.*

Under the Illinois Act, Ill.Rev.Stat. ch. 121½, ¶ 137.51, et seq., any take-over offer for shares of a target company must be registered with the secretary of state, Id., 137.54.A. The Illinois Act defines "take-over offer" as "the offer to acquire or the acquisition of any equity security of a target company pursuant to a tender offer ...." Among other definition, a target company is defined as a corporation with its principal executive office in Illinois and organized under the laws of Illinois. Id., at ¶ 137.52–10. An offer becomes registered 20 days after a registration statement is filed with the secretary, unless the secretary calls a hearing. Id., at ¶ 137.54.E. The secretary may call a hearing at any time during the 20-day waiting period to adjudicate the substantive fairness of the offer if he believes it is necessary to protect the shareholders of the target company, and a hearing must be held if requested by a majority of a target company's outside directors or by Illinois shareholders who own 10% of the class of securities subject to the offer. Id., at ¶ 137.57.A. If the hearing is held the secretary must deny registration to a tender offer if he finds that it fails to provide full and fair disclosure of material information, or that the take-over offer is inequitable or would work or tend to work a fraud or deceit upon the offerees. Id., at ¶ 137.57.E.

Mite initiated a cash tender offer for all outstanding shares of an Illinois corporation by filing Schedule 14D–1 with the Securities and Exchange Commission in order to comply with the Williams Act. Mite did not comply with the Illinois Act and filed a suit in United States District Court asking for a declaratory judgment that the Illinois Act was preempted by the Williams Act and violated the Commerce Clause.

*Mite, supra,* holds that three provisions of the Illinois Act are preempted by the Williams Act and the Illinois Act unduly burdens interstate commerce in violation of the Commerce Clause.

The issue stated by the Supreme Court is whether the Illinois Act frustrates the objectives of the Williams Act in some substantial way.

The Williams Act, an amendment to the Securities and Exchange Act of 1934, was a response to cash tender offers that removed a number of contests from existing disclosure requirements. The Act requires that the offeror furnish the SEC, the target company, and the shareholders detailed information about the offer. The offeror must disclose information about its identity, source of funds, purpose of purchase, plans to make major changes in the target company and the extent of the offeror's holdings in the target company. (The information required in Schedule 14D–1, *supra,* filed by Mite.) The Act gives shareholders who tender their shares an opportunity to withdraw the shares during the first seven days of the tender offer. Also all shares tendered must be purchased for the same price, including the provision if an offering price is increased, those shares already tendered receive the benefit of the increase.

*Mite* stated: "There is no question that in imposing these requirements, Congress intended to protect investors .... But it also crystal clear that a major aspect of the effort to protect the investor was to avoid

favoring either management or the take-over bidder." Further, it "appeared that Congress intended to strike a balance between the investor, management, and the takeover bidder." *Mite, supra.*

We compare the three provisions of the Illinois Act with the Kentucky Take-Over Act.

The Illinois Act requires a tender offeror to notify the secretary of state and the target company of its intent to make a tender offer and the material terms of the offer twenty business days before the offer becomes effective. The Kentucky Act bars a take-over bid unless at least twenty days prior thereto there is a public announcement of the terms of the bid and the information in KRS 292.570(3) is filed with the director of securities and the target company. It is obvious that the pre-tender notification requirements in the Illinois Act and the Kentucky Act are substantially the same. The critical requirement is the twenty-day notice in both Acts. This is the condition found to be repugnant by the Supreme Court as a conflict with the Williams Act.

"The contrast with the Williams Act is apparent. Under that Act, there is no pre-announcement notification requirement; the critical date is the date a tender offer is 'first published or given to security holders.'

". . . (B)y providing the target company with additional time within which to take steps to combat the offer, the precommencement notification provisions furnish incumbent management with a powerful tool to combat tender offers, perhaps to the detriment of the stockholders who will not have an offer before them during this period. These consequences are precisely what Congress determined should be avoided, and for this reason, the precommencement notification provision frustrates the objectives of the Williams Act. The target company is left free to exercise any activity in opposition to the tender offer and this conflicts with the "neutrality" of the Williams Act." *Mite, supra.*

Further the Supreme Court found that the hearing provisions of the Illinois Act "frustrate the congressional purpose by introducing extended delay into the tender offer."

The Illinois Act allows the Secretary of State to call a hearing and the offer is delayed during the hearing. There is no deadline for the completion of the hearing and the secretary is required to call a hearing if requested to do so by 10% of the outstanding shares of stock. The Supreme Court observed that in many cases management will control directly or indirectly 10% of the company's shares, this provision would allow management to delay the offer by calling for a hearing. The Kentucky Act with respect to hearings is not as elaborate as the Illinois Act, and discretion for holding the hearing remains with the director. However, there is no time limit on a hearing.

*Mite* found this hearing provision in conflict with the Williams Act stating:

"(I)t is clear that this short waiting period (the ten-day period for proration provided by sec. 14(d)(6) of the Securities Exchange Act, which applies only after a tender offer is commenced) was founded on congressional concern that a longer delay might unduly favor the target firm's incumbent management, and permit them to frustrate many pro-competitive cash tenders. This ten-day waiting period thus underscores the basic purpose of the Williams Act—to maintain a neutral policy towards cash tender offers, by avoiding lengthy delays that might discourage their chances for success."

The Kentucky Act is different from the Illinois Act only in degree, and the hearing provision with no time limit contains the possibility of delay which frustrates the neutral purposes of the Williams Act. We are of the opinion the Kentucky Act is not as objectionable as the Illinois Act, but is so objectionable as to fall within the prohibitions of *Mite*.

The last issue addressed by *Mite* is the portion of the Illinois Act allowing the secretary of state to pass on the fairness of a tender offer. The secretary must deny reg-

istration of a take-over offer if he finds that the offer "fails to provide full and fair disclosure to the offerees . . . or that the take-over offer is inequitable." The Kentucky Act does not allow the director to pass on the fairness of the offer as such, but confines the director after a hearing to adjudicate if "the offeror proposes to make a fair, full and effective disclosure to offerees of all information material to a decision to accept or reject the offer."

*Mite* observed the Williams Act was "designed to make the relevant facts known so that shareholders have a fair opportunity to make their decision . . . . . . . (T)he state then offers investors protection at the expense of investor automony an approach quite in conflict with that adopted by Congress."

While the Kentucky Act does not allow an inquiry into fairness of the offer, and in that respect the third issue in *Mite* is not on point, the Act, however, requires an adjudication of whether there is a fair, full and effective disclosure. The conflict here is that the terms of the disclosure in the Williams Act are set out in information required to be incorporated in Schedule 14D and Schedule 13D filed with the SEC and the disclosure requirements are tested by the Williams Act in that form and not by the director of securities in this state.

We are of the opinion the provisions of the Kentucky Take-Over Act discussed here are so similar or the same as the Illinois Act so as to make the holdings in *Mite* applicable here.

Applicable to the Kentucky Act is this summary of the holding in *Mite:*

"The Illinois Act violates these principles for two reasons. First, it directly regulates and prevents, unless its terms are satisfied, interstate tendered offers which in turn would generate interstate transactions. Second, the burden the Act imposes on interstate commerce is excessive in light of the local interests the Act purports to further."

*Mite* went on to say:

"States have traditionally regulated intrastate securities transactions, and this court has upheld the authority of states to enact "blue-sky" laws against Commerce Clause challenges on several occasions. . . . The Court's rationale for upholding blue-sky laws was that they only regulated transactions occurring within the regulating states. 'The provisions of the law . . . apply to disposition of securities *within* the State and while information of those issued in other States and foreign countries is required to be filed . . . they are only affected by the requirement of a license of one who deals with them *within* the State. . . . Such regulations affect interstate commerce in securities only incidentally.' "

.         .         .         .         .

"Indeed, the Illinois law on its face would apply even if not a single one of Chicago Rivet's shareholders were a resident of Illinois, since the Act applies to every tender offer for a corporation meeting two of the following conditions: the corporation has its principal executive office in Illinois, is organized under Illinois law, or has at least 10% of its stated capital and paid-in surplus represented in Illinois. . . . ."

"It is therefore apparent that the Illinois statute is a direct restraint on interstate commerce and that it has a sweeping extraterritorial effect. Furthermore, if Illinois may impose such regulations, so may other states; and interstate commerce in securities transactions generated by tender offers would be thoroughly stifled. . . . . The Commerce Clause also precludes the application of a state statute to commerce that takes place wholly outside of the state's borders, whether or not the commerce has effects within the state.

.         .         .         .         .

"The Illinois Act is also unconstitutional under the test of *Pike v. Bruce Church, Inc.,* 397 U.S., [137] at 142 [90 S.Ct. 844 at 847, 25 L.Ed.2d 174] for even when a state statute regulates interstate commerce indirectly, the burden imposed on that commerce must not be excessive in

relation to the local interests served by the statute. The most obvious burden the Illinois Act imposes on interstate commerce arises from the statute's previously-described nationwide reach which purports to give Illinois the power to determine whether a tender offer may proceed anywhere.

.        .        .        .        .

"While protecting local investors is plainly a legitimate state objective, the state has no legitimate interest in protecting non-resident shareholders. Insofar as the Illinois law burdens out-of-state transactions, there is nothing to be weighed in the balance to sustain the law. We note, furthermore, that the Act completely exempts from coverage a corporation's acquisition of its own shares."

This language is equally applicable to the Kentucky Act, and we are of the opinion the Kentucky Act is invalid under the Commerce Clause of the U.S. Constitution.

65 *Kentucky Law Journal* 280, 282, notes the local interest approach of the Kentucky Act in strengthening the position of management. The same constitutional issue is raised. "One such issue is preemption, arising from the fact that the special interest nature of the state legislation puts it in opposition to the neutral philosophy of the federal legislation."

In short, Kentucky has no legitimate state interest in protecting shareholders who live outside the state of Kentucky.

Of course the situation in *Mite* involved a classic take-over bid and did not have the issue of when the buying of stock on the open market constitutes a take-over bid. It is interesting that footnote 1 in *Mite* defines a tender offer: "A tender offer has been conventionally understood to be a publicly made invitation addressed to all shareholders of a corporation to tender their shares for sale at a specified price." Note, The Developing Meaning of "Tender Offer" Under the Securities Exchange Act of 1934, 86 Harv.L.Rev. 1250, 1251 (1973). Interestingly enough this note involves a broad

discussion of tender offers, including those situations such as characterized here by Strode as a "creeping tender offer." We note the conclusion of the article:

"Although there is a rather precise conventionally accepted definition of tender offer, it has become clear since 1968 that the meaning of the term as used in the 1934 Act extends beyond this conventional concept. With no alternative definition provided in the statute or the SEC rules, the exact scope of the term tender offer—essential for operation of sections 14(d) and 14(e)—is uncertain at present. It has been proposed in this Note that in addition to conventional tender offers, a tender offer should include any offer to purchase securities likely to pressure shareholders into making uninformed, ill-considered decisions to sell. While not totally free from difficulties in application, this formulation seems to satisfy the need for a standard which is broader and more flexible than one confined to the conventional tender offer, yet one which is still limitable to transactions posing the same dangers to shareholders which sections 14(d) and 14(e) were intended to eliminate."

Whether the *Mite* court would go beyond the conventional tender offer is a matter of conjecture. It does seem that the expanded approach proposed in the *Harvard Law Review* note has the effect of accomplishing all of the purposes of the Williams Act as its express purpose is to protect investors.

The language "offer likely to pressure shareholders into making uninformed, ill considered decisions to sell" would not appear to be applicable in any event to the open market purchases made here as there is no showing that these sales had that effect.

∎ As to Strode's cross-appeal, we are of the opinion the Court of Appeals is correct and there is no statutory provision to authorize a court order of divestiture of the stock.[3] KRS 292.991 provides for penalties

**3.** A good argument could be made that this issue is moot as Esmark received approval of the trial court to sell its Reliance stock and did so.

and KRS 292.570(2) by its terms contemplates that the prohibition against making a take-over bid applies where more than 5% of the outstanding shares is purchased. This holding disposes of Strode's disgorgement issue. Further we do not get into the esoteric personal service question.

The decision of the Court of Appeals holding the provisions of the take-over act valid is reversed and the decision of the Court of Appeals reversing the trial court's judgment directing divestiture is affirmed with directions that the trial court dismiss the action filed by Strode.

All concur.